# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS

JOLT INITIATIVE, INC.,

      *Plaintiff*,

v.

KEN PAXTON, in his individual and official capacity as Attorney General of Texas,

      *Defendant*.

Case No.: 1:25-cv-1808-RP

## FIRST AMENDED COMPLAINT

1.      This case is brought to halt a campaign of unconstitutional intimidation targeting Plaintiff Jolt Initiative, Inc. (Jolt), a nonprofit organization that works to increase the civic participation of young Latinos in Texas, for exercising its freedom of speech and association and its right to petition the courts for the redress of grievances.

2.      More than a year ago, Defendant Attorney General Ken Paxton initiated this campaign against Jolt by issuing an intrusive and groundless document demand known as a Request to Examine (RTE), issued without any court finding that it was legally justified.  The RTE demanded that Jolt disclose confidential information, including the identities of its volunteers and other associates.

3.      Providing the information that Defendant's RTE sought would have exposed Jolt, its Volunteer Deputy Registrars (VDRs), and the Texas voters with whom they engage, among other associates, to further intimidation and threats, and would have chilled their exercise of

fundamental expressive freedoms.  Accordingly, Jolt brought a federal lawsuit challenging the RTE under the First Amendment, among other claims, and seeking declaratory and injunctive relief.  *Jolt Initiative, Inc. v. Paxton* (*Jolt I*), 1:24-cv-1089-RP (W.D. Tex.).

4.      Rather than defend against Jolt's federal lawsuit, Defendant withdrew the RTE and secured Jolt's agreement to voluntarily dismiss the case based on written assurances that he would not serve a new RTE concerning the same subject matter.  The district court therefore issued an order closing Jolt's case on October 23, 2025.

5.      But Defendant's retaliatory campaign did not cease.  That same day, Defendant filed an action in the District Court of Tarrant County, Texas, seeking to revoke Jolt's corporate charter through a civil quo warranto proceeding based on the same groundless and unsubstantiated allegations on which he had attempted to justify the RTE.  *Texas v. Jolt Initiative, Inc.*, No. 352-371410-25 (D. Ct. Tarrant County, Tex.).

6.      Defendant's ongoing campaign against Jolt is in retaliation for the group's voter-registration activity—expression and association that is protected by the First Amendment.  In addition, Defendant initiated the quo warranto proceeding in retaliation for Jolt petitioning the government for redress of grievances by filing a federal lawsuit challenging Defendant's RTE.

7.      In connection with the quo warranto proceeding, Defendant has made discovery requests that are a broader and more invasive version of the RTE that Jolt challenged in *Jolt I*. Like the RTE, Defendant's discovery requests demand that Jolt disclose confidential information, including the identities of its volunteers and other associates.  Providing the information that Defendant seeks would expose Jolt, its VDRs, and the Texas voters with whom they engage,

among other associates, to further intimidation and threats, and would chill their exercise of fundamental expressive freedoms.

8.      Defendant's attacks on Jolt also constitute impermissible intimidation under § 11(b) of the Voting Rights Act (VRA), which protects Plaintiff's right to "urg[e] or aid[] any person to vote or attempt to vote."  52 U.S.C. § 10307(b).

9.      Jolt therefore asks the Court to protect its First Amendment freedoms of speech, association, and petition, as well as its rights under the VRA.

## JURISDICTION AND VENUE

10.      Plaintiff's claims are brought under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution and under 52 U.S.C. § 10307(b).

11.      This Court has jurisdiction to hear Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343, and 52 U.S.C. § 10308(f).  The Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

12.      Venue is proper in the United States District Court for the Western District of Texas under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts that gave rise to this lawsuit have occurred or will occur in this judicial district.  This District is also an appropriate venue under 28 U.S.C. § 1391(b)(1) because Defendant resides in this judicial district.

## PARTIES

13.      Jolt Initiative, Inc., is a nonprofit organization that is incorporated in Texas and exempt from taxes under § 501(c)(3) of the Internal Revenue Code.  Jolt engages in a wide range of expressive and associative acts encouraging Texans to vote.

14.      Defendant Ken Paxton is the Attorney General of the State of Texas.

## FACTS

### A.  Jolt Initiative

15.     Jolt Initiative, and its sister organization Jolt Action, Inc., were founded to increase the civic participation of Latinos in Texas in order to build a stronger democracy and ensure that everyone's voice is heard.  Jolt Initiative and Jolt Action are separate organizations, with distinct boards of directors and separate bank accounts.

16.     Jolt is focused on mobilizing young Latino voters (those aged 18 to 32) in particular.

17.     In addition to voter registration drives, Jolt uses public education campaigns, leadership programming, and other measures to encourage eligible Latinos to vote.

18.     Jolt and Jolt Action also speak out on matters of importance to Latinos in Texas, and Jolt Action is often critical of government institutions and politicians, including the Attorney General.

### B.  Voter Registration Drives

19.     A key part of Jolt's effort is registering eligible Texans to vote.  Jolt strives to encourage as many eligible Latinos in Texas to vote as possible.

20.     Jolt conducts voter registration drives in Texas, with a primary focus in Dallas, Harris, and Bexar Counties.  Because of Jolt's efforts, several thousand Texans have been added to the voter rolls in recent years.

21.     A vital part of Jolt's mission is ensuring that community members conduct nonpartisan voter registration in accordance with state law.

22.     To carry out its voter registration drives, Jolt uses Volunteer Deputy Registrars

4

(VDRs), which may be paid members of their staff or organizational volunteers.

23.    VDRs are individuals who are appointed by county registrars and are "empowered to receive and deliver completed voter registration applications." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 385 (5th Cir. 2013).

24.    Texas created VDRs "[t]o encourage voter registration." Tex. Elec. Code § 13.031(a); *see* Brief of Former Governor Mark White et al. as Amicus Curiae in Support of Appellee at 14–15, *Voting for America*, 732 F.3d 382, 2012 WL 5996185 ("The intent of the voter registration system was to open the doors as wide as possible to every single, eligible qualified voter and not exclude anybody under any circumstance." (internal quotation marks and alteration omitted)).

25.    Any person who is 18 years old and eligible to vote in Texas—and not disqualified by virtue of certain criminal convictions—is entitled to become a VDR upon applying to do so in each county in which they wish to register voters. Tex. Elec. Code §§ 13.031(d), 13.032.  Each VDR receives a Certificate of Appointment that contains the VDR's voter registration number and residential address. *Id.* § 13.033.

26.    VDRs may provide blank voter registration forms to potential voters and must deliver completed forms to the county registrar within five days.  *See* Tex. Elec. Code § 13.042. VDRs review the information on registration forms for completeness, but they have no power to determine whether an applicant is actually eligible to vote.  Tex. Elec. Code § 13.039; *Volunteer Deputy Registrars*, Tex. Sec'y State, https://perma.cc/38F6-CED5?type=image.  A VDR is legally required to submit every completed voter registration form to the county registrar within five days. Tex. Elec. Code §§ 13.042, 13.043.  The county registrar then makes the determination whether the

applicant is eligible to be added to the voter rolls.  *Id.* § 13.072.

27.    Upon receipt of a completed application, the VDR provides the applicant with a receipt.  State law provides that a duplicate of the receipt should be provided to the registrar, along with the applicant's voter registration form, unless an alternative system is prescribed.  Tex. Elec. Code § 13.040.

28.    Jolt VDRs are always properly appointed in the county in which they register voters.

29.    A typical Jolt voter registration drive involves a Jolt VDR being located in a place with high foot traffic.  The VDR typically will have written materials about voting and registering to vote, as well as blank registration forms.  If a person wants to register to vote, a VDR will explain the eligibility requirements, answer any questions, and walk the person through the process of filling out a voter registration form.

30.    Jolt VDRs comply with all applicable laws.  Jolt undertakes rigorous training, supervision, and quality control protocols to ensure compliance with Texas's VDR scheme and to minimize error, including regular consultation with election-law counsel.

**C. Defendant's Baseless Investigation into Voter Registration Groups**

31.    On August 18, 2024, a television personality with a history of promoting conspiracy theories posted on X that people who were ineligible to vote were being registered at locations in North Texas.  *See* Maria Bartiromo (@MariaBartiromo), X (Aug. 18, 2024, 9:56 AM), https://perma.cc/B7MD-PRKC; *see* Berenice Garcia, *A Fox News Host's Debunked Election Conspiracy Appears to Have Prompted a State Investigation*, Tex. Trib. (Aug. 26, 2024), https://perma.cc/9PM6-H9YS.

32.     Both the Parker County Republican chair and election administrator said there was no evidence to support the charge.  *See* Garcia, *supra*; Brady Gray (@Brady_Gray), X (Aug. 19, 2024, 10:12 PM), https://x.com/Brady_Gray/status/1825717561054376102.

33.     The next day, Defendant sent an undercover investigator to a Texas Department of Public Safety (DPS) office in Universal City, Texas, in Bexar County, to investigate Jolt's voter-registration activities.  The investigator claimed to be a father seeking to register his daughter, who was not with him.

34.     In response to the investigator's questions, a Jolt VDR who no longer is employed by the organization accurately conveyed to the investigator that Texas law allows a parent to register their eligible child to vote.  *See* Tex. Elec. Code § 13.003.

35.     Notwithstanding the fact that the former Jolt VDR did nothing more than accurately convey what Texas law permits, the investigator filed a report accusing the former Jolt VDR of violating Texas's election code.

36.     The next day, a self-described "citizen journalist" and "Alpha MAGA Male" posted a video on X in which he purported to confront a Jolt VDR outside of a Texas DPS office.  *See* hernando arce (@hernandoarce), X (Aug. 20, 2024, 1:53 PM), https://x.com/hernandoarce/status/1825954284858417608.  The post said, "we have Marxist non profit organizations like @JoltAction infiltrating Texas @TxDPS locations in San Antonio," and it tagged @KenPaxtonTx, among others.  *Id.*

37.     The video depicts no illegal activity or evidence of wrongdoing.

38.     On August 20, 2024, the same day that the self-described "citizen journalist" posted about Jolt on X, the Attorney General's office executed a series of raids on the homes of people

associated with the League of United Latin American Citizens (LULAC), another Latino-focused organization that encourages eligible Texans to register to vote.  *See* Fin Gómez & Nidia Cavazos, *Texas Attorney General Ken Paxton Raids Latino Democrats' Homes, Including Those of LULAC Members*, CBS News (Aug. 27, 2024), https://perma.cc/M7BL-W4Y7; Roman Palomares, *LULAC Fights Back: How We're Standing up to Texas's Voter Suppression*, https://lulac.org/texas_raids/ ("Paxton has been aggressively targeting and harassing Latino-led organizations, . . . as well as individual citizens.").

39.     One of the people targeted was Lidia Martinez, an 87-year-old retired educator in San Antonio who is a member of LULAC.  *See* Edgar Sandoval, *Latino Civil Rights Group Demands Inquiry Into Texas Voter Fraud Raids*, N.Y. Times (Aug. 25, 2024), https://www.nytimes.com/2024/08/25/us/texas-latinos-democrats-raids-paxton.html.  Armed agents swept through her house before 6 a.m., rifling through her clothes, seizing her electronics, and questioning her for three hours.  *Id.* The event "scared' Martinez, who "still felt shaken" days later. *Id.*

40.     The following day, Defendant put out a press release announcing that he had "opened an investigation into reports that organizations operating in Texas may be unlawfully registering noncitizens to vote in violation of state and federal law."  Press Release, Tex. Office of Att'y Gen., *Attorney General Ken Paxton Launches Investigation into Reports That Organizations May Be Illegally Registering Noncitizens to Vote* (Aug. 21, 2024), https://perma.cc/EF4H-E6PP. The press release cites the existence of voter registration efforts taking place outside Texas DPS offices, speculating that "there is no obvious need to assist citizens to register to vote outside DPS offices," and "calling into question the motives of the nonprofit groups."  *Id.*  The press release

promises that "[a]ny wrongdoing will be punished to the fullest extent of the law."  *Id.*

41.    Notwithstanding Defendant's pretextual reasons for the investigation into voter registration drives, "[e]very legitimate study ever done on the question shows that voting by noncitizens in state and federal elections is vanishingly rare."  Sean Morales-Doyle, *Noncitizens Are Not Voting in Federal or State Elections—Here's Why*, Brennan Ctr. for Just. (Apr. 12, 2024), https://perma.cc/WCX3-YKVC.  One recent study, which looked at 42 jurisdictions in the 2016 general election, found 30 incidents of suspected noncitizen voting among 23.5 million votes—a rate of 0.0001%.  *See id.*

42.    Jolt and its associates reacted to news of Defendant's investigation with alarm.

43.    On August 23, 2024, Jolt Action sent out an email blast to thousands of supporters titled: "URGENT: Paxton Investigation Disrupts Jolt Organizers' Important Work."  In this email, Jolt Action accused the Attorney General of "suppress[ing] voter registration" and "attack[ing] Texans once again."

44.    Also on August 23, 2024, Jolt Action publicly criticized the Attorney General on its Facebook page, writing that "we won't stay quiet, and we are prepared to make our voices heard to ensure voting rights aren't infringed upon."  An image included with the post stated: "AG Investigation Disrupts Jolt Organizers' Important Work."

**D.  Defendant's RTE to Jolt Initiative**

45.    Despite having no evidence (or even reasonable suspicion) of wrongdoing, the Attorney General promptly targeted Jolt.

46.    On August 31, 2024, Jolt Initiative received a Request to Examine (RTE) from the Office of the Attorney General.  A true and accurate copy of the RTE is attached as Exhibit A.

47.      The RTE instructed Jolt Initiative to provide, by September 19, 2024, four categories of documents:

    1. Each of Your volunteer deputy registrars' certificates of appointment.

    2. All Documents Jolt provides to your volunteer deputy registrars Concerning the voter registration application process.

    3. All Documents Jolt provides to your volunteer deputy registrars Concerning Your role in the voter registration application process.

    4. Each of the completed registration receipts created pursuant to Texas Election Code § 13.040 and maintained by You.

48.      Defendant did not identify any reason why he needed the documents.  He did not accuse Jolt of any wrongdoing.  And he did not obtain permission or authority from a court to obtain these documents.

49.      Defendant purported to issue the RTE pursuant to Texas Business Organizations Code § 12.151, which allows the Attorney General to inspect corporate records "as the attorney general considers necessary in the performance of a power or duty of the attorney general, of any record of the entity."

50.      The RTE further threatened that if Jolt did not comply, the Attorney General could take action under Texas Business Organizations Code § 12.155, which provides that failure or refusal to permit the Attorney General to inspect records "forfeits the right of the entity to do business in this state, and the entity's registration or certificate of formation shall be revoked or terminated."

51.      It is also Class B misdemeanor to fail to or refuse to provide records requested by the Attorney General.  *See* Tex. Bus. Orgs. Code § 12.156.

52.      Jolt filed a lawsuit in federal court challenging the RTE under 42 U.S.C. § 1983 and

the First, Fourth, and Fourteenth Amendments to the United States Constitution, and under § 11(b) of the Voting Rights Act of 1964, 52 U.S.C. § 10307(b).  *Jolt Initiative, Inc. v. Paxton* (*Jolt I*), 1:24-cv-1089-RP (W.D. Tex.).  In that litigation, Jolt filed a motion for a preliminary injunction barring enforcement of the RTE.

53.     Because of developments in a case raising similar legal issues, the parties agreed to stay district court proceedings in *Jolt I* until the related case was resolved.  The parties further agreed that Jolt's obligation to respond to the RTE would be extended until after the stay was lifted.

54.     After the related case was resolved and the stay was lifted, Defendant voluntarily withdrew the RTE before the district court had ruled on Jolt's motion for a preliminary injunction. Counsel for Defendant later represented in writing that Defendant had no intention to re-issue an RTE concerning the same subject matter.  Based on that representation, the parties agreed on October 22, 2025, to voluntarily dismiss the case under Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure.

55.     The district court issued an order the following day closing the case.

**E. Defendant's Quo Warranto Proceedings Against Jolt Initiative**

56.     On October 23, 2025—the same day that the district court closed the case challenging the RTE that Defendant had issued to Jolt—Defendant filed a motion for leave to file an original petition and information in the nature of quo warranto in the District Court of Tarrant County, Texas.  A true and correct copy of the quo warranto motion (Mot.) is attached as Exhibit B.  A true and correct copy of the proposed quo warranto petition (Pet.) is attached as Exhibit C.

57.     Based on the same debunked factual allegations that triggered Defendant's RTE, the motion to file a quo warranto petition accuses Jolt of "systematically, knowingly, willfully, deliberately, and recklessly misus[ing] individuals and Volunteer Deputy Registrars ('VDR') to acquire and submit unlawful voter registration applications that violate the Texas Election Code and undermine the State's democratic processes."  Pet. 3.

58.     Defendant identified no allegation beyond the specious examples that it cited in support of the initial RTE that was the subject of earlier federal court proceedings. Even though nothing had changed, the allegations that Defendant previously claimed justified an investigation now justified—according to Defendant—the ultimate corporate penalty.

59.     The wrongdoing alleged by Defendant occurred in Bexar County, and Jolt Initiative's principal office is in Harris County. Defendant has identified no allegation connecting any part of its quo warranto action to Tarrant County, raising concerns of attempted forum shopping.

60.     The proposed petition also condemns Jolt for bringing its previous lawsuit in this District challenging the legality of Defendant's RTE as demonstrating Jolt's refusal to "cooperat[e] with the State's investigation" and as aimed at "stall[ing] the investigation through the 2024 election."  Pet. 7.  Defendant forthrightly admits that he initiated the quo warranto proceeding "[i]nstead" of defending the legality of his RTE in the previous litigation. *Id.* at 7. And the petition states, in its section addressing Jolt's filing of the prior federal lawsuit, that Defendant "now commences this lawsuit to hold JOLT accountable for its underlying systematic and unlawful conduct and to revoke JOLT's right to transact business in Texas." *Id.*

61.     Neither the motion nor the proposed petition attached thereto identifies any

wrongdoing by Jolt or any of its VDRs.

62.     Instead, the motion and proposed petition single out Jolt based on its perceived ideological motivation and its protected expression, with which Defendant personally disagrees. For example, Defendant's proposed petition complains (without factual support) that "JOLT engages in partisan political efforts intending to undermine election integrity," and "attempts to circumvent the opportunity for Republican and Conservative political candidates to get elected in the State violating the principles of democracy." Pet. 9.  Defendant also points to examples of Jolt's purportedly "divisive rhetoric," which it characterizes as "criticiz[ism] and demoniz[ation] [of] the election of Republican and Conservative politicians, such as President Donald J. Trump," *id.* at 3-4, and "resentment for Republican and Conservative political ideology," Mot. 1.

63.     The proposed quo warranto petition seeks forfeiture of Jolt's rights and privileges as a registered corporation; dissolution of Jolt's corporate registration and charter; and appointment of a receiver to wind up Jolt's corporate affairs.  Pet. 11.

64.     On November 11, 2025, Defendant issued a press release announcing the filing of the quo warranto action.  Press Release, Tex. Office of Att'y Gen., *Attorney General Ken Paxton Sues Radical Activist Organization for Unlawfully Registering Illegals to Vote in Texas* (Nov. 10, 2025), https://tinyurl.com/ye2tv7mk.  The press release falsely describes Jolt as a "radical open-borders group" and "a radical, partisan operation."  *Id.*  It also falsely accuses Jolt of "orchestrating a systematic, unlawful voter registration scheme that is designed to sabotage Texas election integrity and allow illegals to vote," "knowingly attempt[ing] to corrupt our voter rolls and weaken the voice of lawful Texas voters," and "recruit[ing] and solicit[ing] individuals to submit unlawful voter registration applications, which could be designed to register illegal aliens who lack proper

identification." *Id.*

65.     The inflamatory and false statements in Defendant's press release stoked further harassment of Jolt by third parties.  For example, an individual re-shared Defendant's post on X publicizing the press release and suggested that "Texas patriots" should "help Ken out and pay this [sic] people a visit."  Grumpy Old Bastart (@dougla16338), X.com (Nov. 10, 2025, 12:45 ET), https://x.com/dougla16338/status/1987939745314562151.  A true and correct copy of the post is set forth below.



66.     On December 9, 2025, Defendant filed an amended motion for leave to file a quo warranto petition.  The accompanying amended proposed quo warranto petition is functionally the

same as the original except that it omits one of the main allegations against Jolt in the original

proposed petition: the undercover investigator's report. *See* Exhibit D.

      **F.**    **Defendant's Discovery Requests**

      67.    On December 30, 2025, Defendant served sweeping and invasive discovery requests

in connection with his retaliatory quo warranto action. *See* Exhibit E.

      68.    Unless otherwise ordered or agreed, Jolt's deadline to respond to the discovery

requests is January 29, 2026. *See* Tex. R. Civ. P. 196.2(a), 197.2(a), 198.2(a).

      69.    Defendant issued these discovery requests even though Jolt had filed a motion to

transfer venue of the quo warranto proceedings on November 10, 2025, that was scheduled for a

hearing on February 6, 2026, and even though the District Court for Tarrant County had not

granted leave for Defendant to proceed with his quo warranto action.

      70.    The propounded discovery includes 28 requests for admission, 5 interrogatories, and

25 requests for production. Ex. E, at 8–14.

      71.    Defendant's requests seek highly sensitive information about Jolt, its employees and

volunteers, and the voters with whom its employees and volunteers associate.

      72.    The propounded discovery contains requests for production that are similar if not

identical to requests in Defendant's voluntarily withdrawn RTE that Jolt challenged in *Jolt I*.

*Compare id.* at 11 (interrogatory number 1), *and id.* at 12–13 (requests for production numbers 1–

3, and 11), *with* Ex. A, at 6.

      73.    But Defendant's discovery requests also seek far broader and more invasive

disclosure of Jolt's associations with employees, volunteers, and voters than the RTE did.

74.     For example, the propounded discovery requests demand Jolt to identify the locations, dates, and times of all voter-registration drives that it has organized and the names of the VDRs who participated in each of those drives.  Ex. E, at 11 (interrogatories 3 and 4); *see also id.* (requesting in interrogatory 2 that Jolt identify the locations, dates, and times that Jolt has "dispatched" VDRs "to distribute voter registration applications"); *id.* (requesting in interrogatory 5 that Jolt identify "all educational institutions" at which it has "engaged in outreach").

75.     The propounded discovery also requires Jolt to produce other sensitive information that bears on its associational activity, including its payroll information; "rosters"; emails and text messages "directing the activities of individuals involved with voter registration"; and tax returns. *Id.* at 12–13 (requests for production numbers 4–8).

**G.**     Defendant's Ongoing Campaign Is Irreparably Harming Jolt

76.     Jolt has felt the effects of the Attorney General's intimidation campaign in multiple ways.  The campaign has harmed Jolt's reputation, diverted its resources away from its voter-registration activities, forced Jolt to incur additional costs, and reduced its fundraising, which in turn has forced Jolt to lay off staff, resulting in a significant reduction in the number of voters that Jolt registers.

77.     Without identifying any law that Jolt or its VDRs have violated, Defendant baselessly accuses Jolt of "commit[ing] criminal conduct pertaining to voter registration applications" and of "systematically subverting the election process and violating Texas election law by recruiting, training, and directing individuals to submit false, or otherwise unlawful, voter registration applications."  Pet. 1.

78.     By accusing Jolt of criminal wrongdoing—without identifying any alleged violation

of law, let alone any evidence of wrongdoing—Defendant has and continues to sully Jolt's reputation.  As the Texas Supreme Court has recognized, "[a]ccusing someone of a crime" is "so obviously harmful that general damages, such as mental anguish and loss of reputation, are presumed." *In re Lipsky*, 460 S.W. 3d 579, 596 (Tex. 2015).

79.     The misinformation that the Defendant has broadcasted about Jolt in his court filings and public statements also has harmed Jolt's reputation with peer organizations and partners.  Some events with peer organizations have been cancelled because of Jolt's partners' fears of being associated with Jolt and targeted for similar harassment by Defendant.

80.     At a voting-rights convening, some potential new partners have been familiar with Jolt not because of its work to increase civic participation among Latinos but because of the misinformation that Defendant has disseminated about the organization through his public statements and court filings, requiring Jolt staff to correct the record.

81.     To counteract the misinformation that Defendant is spreading, Jolt has been forced to hire a crisis communications firm at a cost ranging from $8,500 to $10,000 per month.

82.     Jolt has always taken great care to ensure that its VDRs are well-trained on Texas election law and that all voter registration forms that it gathers are completely and legibly filled out.  But Jolt has instituted new administrative tasks that go well beyond what Texas law or best practices require in response to the Attorney General's unjustified and invasive scrutiny of Jolt's activities so that it can defend itself against any spurious accusations of wrongdoing. As a result, Jolt staff who in the past typically spent five to six hours in the field per day now spend around four hours per day in the field, with the remainder of the time undertaking redundant and unnecessary documentation of their activities.

83.     Defendant's publicity around the RTE investigation resulted in threats of violence toward Jolt and VDRs.

84.     For example, in a reply to the video that a self-described "citizen journalist" and "Alpha MAGA Male" posted on X in which he purported to confront a Jolt VDR outside of a Texas Department of Public Safety office, one X user posted: "TARGET PRACTICE." Coonass69 (@coonass70), X (Aug. 22, 2024, 8:16 AM), https://perma.cc/6ELX-5DY7.



85.     In response to a post from an activist saying he is "continu[ing] my hunt for Marxist Anti American organizations like @JoltAction," an X user replied: "I too want to go hunting these scum."  Mr. Super Angry (@1AlphaOmega66), X (Sept. 5, 2024, 9:08 AM), https://perma.cc/2F9L-2XR6.   Another person replied to post the name and LinkedIn profile of a Jolt Action board member. See Robert Johnson (@jdata17), X (Sept. 4, 2024, 9:48 PM), https://perma.cc/4DDH-X5R3.



86.    Defendant's announcement in August 2024 of his investigation into groups conducting-voter registration, *see* Compl. ¶ 39, ECF No. 1, triggered additional violent commentary on social media, with people publicly calling for the execution of those involved with the nonprofits being investigated.  For example, on Patriots.Win, a user demanded that people "[s]tart hanging NGO agents as traitors and enemies of the state" in response to a post about Defendant investigating organizations doing voter registration drives.  *See* @POTUS_DonnieJ, Patriots.Win (Aug 21, 2024, 6:04 PM), https://patriots.win/p/17txtLGjt0/-texas-attorney-general-ken-paxt/c/4ZDtR7R5dVn.



87.     In response to a similar post, another user called for "a public hanging in the public square." @sixfingerdildo, Patriots.Win (Aug. 21, 2024, 9:11 PM), https://patriots.win/p/17txtLHZAM/texas-ag-paxton-opens-undercover/c/4ZDtR7Vc7CJ. Another called for a "[f]iring squad for treasonous NGOs." @bringbackthe80s, Patriot.Win (Aug. 21, 2024, 7:56 PM), https://patriots.win/p/17txtLHZAM/texas-ag-paxton-opens-undercover/c/4ZDtR7UScHQ.

88.     Other groups that engage Latino voters in the civic process have received similar violent threats in the wake of Defendant's campaign of harassment.  For example, one commentator praising the Attorney General's raid on LULAC members' homes stated that he wanted to see LULAC members "get gunned the fuck down for everyone to see.  Just twitch motherfucker just fucking breathe wrong and be on the receiving end of a mag dump.  Time for these assholes to live in fear." @Datamancer, Patriots.Win (Aug. 29, 2024, 5:56 PM), https://patriots.win/p/17ty2krkCO/texas-ag-ken-paxton-launches-ele/c/4ZDtkvrJn7Z.



Datamancer   26 points   14 days ago
Light them the fuck up. I so fucking want one of these dems to resist and get gunned the fuck down for everyone to see. Just twitch motherfucker just fucking breathe wrong and be on the receiving end of a mag dump.

Time for these assholes to live in fear.
permalink  award  deport  block  reply

89.     These supporters of Defendant's retaliatory campaign understood that the goal was intimidation.  "The process is the punishment.  Destroy their lives." @Cuck_Slayer24, Patriots.Win (Aug. 30, 2024, 7:14 AM), https://patriots.win/p/17ty2krkCO/texas-ag-ken-paxton-launches-ele/c/4ZDtl0XzIlX.

Cuck_Slayer24  1 points  13 days ago
Finally fucking someone somewhere starts putting the screws to these commie fucks. The process is the punishment. Destroy their lives.
permalink  award  deport  block  reply

90.    Because of staff concerns about harassment by Defendant and his supporters, Jolt also has instituted ongoing training on safety and on how to deescalate situations in the field. These trainings have diverted staff time and resources away from voter-registration work.

91.    In response to concerns about reprisals by Defendant, Jolt also has upgraded its insurance policy to cover staff, increasing its premium from $9,388 to $12,238 per year.

92.    Defendant's retaliatory campaign also has forced Jolt to hire counsel.  Similar attacks on another group that does voter-registration work, Powered by People, resulted in legal fees of more than $400,000 over the span of only six weeks.  Elanor Klibanoff, *Ken Paxton's Legal Crusade Against Beto O'Rourke Is Faltering Before an All-Republican Appeals Court*, Tex. Trib. (Sept. 17, 2025), https://tinyurl.com/33fzexd7.

93.    Jolt's fundraising also has suffered because of Defendant's ongoing retaliatory campaign.  At the beginning of the year, Jolt Initiative projected that it would raise $2.1 million overall, including $1 million for its voter-registration and civic-education efforts specifically. Instead, it has raised only $407,722 for general operations, with none of those funds earmarked for the voter-registration and civic-education efforts that are the heart of Jolt's mission.

94.    Jolt's deteriorating financial situation has required it to lay off staff.  This in turn has negatively affected Jolt's ability to register voters.  In a typical year without statewide or federal elections, Jolt usually registers over 12,000 voters.  In 2025, Jolt has registered only 3,586 voters.

95.    The discovery requests that Defendant issued on December 30, 2025, impose

additional harms on Jolt.  The requests demand confidential information, and Jolt cannot disclose that information without irreparably harming its mission, its associates, and its constitutionally protected efforts.

96.    Upon information and belief, the Attorney General has previously tried to make public the confidential records he received in response to his investigations.  For example, he tried to make public bank account numbers and other highly confidential records produced in response to an RTE, and he would have succeeded if a judge had not prevented it.

97.    After being served with similar—but narrower and less invasive requests—in Defendant's RTE, Jolt leadership promptly discussed the requests with board members, who were shaken, upset, and frustrated that Jolt was being unfairly targeted with this unreasonable demand.

98.    The board concluded that it could not comply with the RTE without jeopardizing the safety of its VDRs or the confidences of its partners and the Latino community.  If Jolt were to provide the documents requested, it would make it more difficult for Jolt to fulfill its mission of encouraging Latinos to become more politically active.

99.    Latinos in Texas have particular reason to fear the Attorney General, given his open efforts to intimidate groups and people with whom he disagrees and his ongoing targeting of immigration-related nonprofits.  *See* J. David Goodman, *A Legal Blizzard in Texas Targets Democrats and Promotes Ken Paxton*, N.Y. Times (Oct. 31, 2025), https://tinyurl.com/mtmezt42; Alejandro Serrano & Vianna Davila, *Attorney General Ken Paxton Targets El Paso Nonprofit that Offers Legal Services to Migrants*, Texas Trib. (Sept. 26, 2024), https://tinyurl.com/yx2928hb (noting that Defendant investigated at least five Texas nonprofits in 2024 whose work focuses on immigration issues).  No one wants to be the next person the Attorney General attacks with a

frivolous threat of prosecution or unjustified law enforcement raid.

100.    Some Latinos in Texas have friends or family members who are undocumented, and they fear that if they draw attention to themselves, they may place their friends or family at risk. Other Latinos may be going through the process of becoming citizens, and they may worry that if they criticize the government or are associated with a controversial stand, they will jeopardize their immigration status.

101.    Jolt is particularly concerned about public disclosure of personal identifying information of its VDRs and the voters they help register.  Such disclosure may subject VDRs and voters to threats and harassing communications, and may even place them at risk of violence from extremists who believe the Attorney General's false accusations that organizations like Jolt are helping ineligible people register to vote.  Jolt's concern for their safety is particularly acute given the numerous violent and threatening comments on social media targeting Jolt and other voter registration groups.

102.    If Jolt were forced to disclose confidential information to the Attorney General, it would be considered a betrayal of the trust that Jolt has earned from the Texas Latino community. It would make it more difficult for Jolt to associate with others and carry out its mission effectively, and it would likely put Jolt employees and others associated with the organization in danger.

103.    As a whole, the quo warranto proceeding against Jolt poses an existential threat.  If Defendant succeeds in revoking Jolt's charter, Jolt will no longer be able to operate, extinguishing its efforts to promote civic engagement in the state of Texas.

## CAUSES OF ACTION

### Count I

### First Amendment – Retaliation (42 U.S.C. § 1983)

104.    Plaintiff incorporates by reference every allegation in the preceding paragraphs as if set forth fully herein.

105.    The Constitution prohibits the government from taking adverse action against a person for the exercise of their First Amendment rights.  *E.g., Nieves v. Bartlett*, 587 U.S. 391, 398 (2019).

106.    To state a claim for retaliation, plaintiffs "must show that (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct."  *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

107.    Jolt engages in a large amount of constitutionally protected expression and association, including by conducting voter registration drives, urging Texans to vote, and speaking out on issues of importance to Latinos in Texas.

108.    The targeting of Jolt with quo warranto proceeding has an objective chilling effect. As described above, Defendant is engaged in an intimidation campaign against individuals and organizations—like Jolt—that seek to promote civic involvement among Latinos in Texas.  A person of ordinary firmness would be discouraged from promoting voter registration and civic engagement under these circumstances.

109.    The quo warranto proceeding is substantially motivated by Plaintiff's First Amendment activities, specifically its organization of Latino community members and encouragement of voter registration.

110.    Defendant has targeted Jolt precisely because Jolt encourages people to register and has repeatedly spoken out about issues related to civic engagement in Texas.

111.    On August 21, 2024, Defendant announced in a press release that he was opening an investigation into whether nonprofit groups where "registering noncitizens to vote in violation of state and federal law."  Press Release, Tex. Office of Att'y Gen., *Attorney General Ken Paxton Launches Investigation into Reports That Organizations May Be Illegally Registering Noncitizens to Vote* (Aug. 21, 2024), https://perma.cc/EF4H-E6PP.

112.    Jolt Action subsequently criticized Defendant for his attempts to intimidate those involved in registering people to vote.

113.    One week after Jolt Action's criticism of Defendant, Defendant sent Jolt the RTE, leading to Jolt's federal lawsuit challenging the RTE.

114.    One day after Jolt agreed to voluntarily dismiss its lawsuit based on Defendant's withdrawal of the RTE and his assurances that he would not serve another regarding the same subject matter, Defendant initiated the quo warranto proceeding.

115.    Defendant's quo warranto proceeding is expressly premised not only on Jolt's protected expression and association, but also on Jolt's efforts to challenge Defendant's invasive and unconstitutional RTE in federal court.

116.    Defendant initiated the quo warranto proceedings "[i]nstead" of defending the legality of the RTE in federal court because he views Jolt's efforts to challenge the

constitutionality of the RTE as a refusal to "cooperat[e] with the State's investigation in any respect" and an effort "to stall the investigation."

117.    Therefore, Defendant's quo warranto proceeding unconstitutionally retaliates against Plaintiff for its constitutionally protected expression and association and its petitioning the government for redress of grievances.

### Count II

### Voting Rights Act – Intimidation (52 U.S.C. § 10307(b))

118.    Plaintiff incorporates by reference every allegation in the preceding paragraphs as if set forth fully herein.

119.    Section 11(b) of the Voting Rights Act provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote."  52 U.S.C. § 10307(b).

120.    Section 11(b) protects those "assisting . . . others in registering to vote" from "official acts of harassment."  *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968).

121.    Through its voter registration drives and voter education campaigns, Jolt "urg[es]" and "aid[s]" eligible Texans to vote.

122.    Defendant's quo warranto proceeding targets Jolt and its associates as a result of their civic engagement and voter registration efforts.

123.    The quo warranto proceeding has the purpose and effect of intimidating, or attempting to intimidate, Jolt and its associates from engaging in these federally protected activities.

124.    Therefore, the RTE violates § 11(b) of the Voting Rights Act.

### Count III

**First Amendment – Freedom of Association (42 U.S.C. § 1983)**

125.    Plaintiff incorporates by reference every allegation in the preceding paragraphs as if set forth fully herein.

126.    The First Amendment's protection of the freedom of association, which applies to the states through the Fourteenth Amendment, provides "protection to collective effort on behalf of shared goals." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). As the Supreme Court has noted, "[p]rotected association furthers a wide variety of political, social, economic, educational, religious, and cultural ends, and is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Ams. for Prosperity Found. v. Bonta* (*AFP*), 594 U.S. 595, 606 (2021) (internal quotation marks omitted).

127.    Freedom of association protects not only "advocacy groups," but also any group that "engage[s] in some form of expression, whether it be public or private." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

128.    Jolt engages in a wide variety of protected expression, including by uplifting the power of young Latino voters, mobilizing young Latino voters with the goal of forging a democracy that works for everyone, seeking to register young Latinos to vote, and advocating for the nearly 11 million Latinos in Texas.

129.    Jolt's association with others is critical to its exercise of its expressive rights.  In order to further its goal of increasing civic participation, Jolt builds the leadership capacity of millennial Latinos to mobilize their peers to action, and it trains community members to conduct nonpartisan voter registration.  If Jolt's relationships with these community members were impaired, Jolt's ability to effectively communicate its message would be significantly impaired.

130.    Jolt and its VDRs engage in "core protected speech" when they encourage citizens to register at Jolt voter registration drives.  *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 390 (5th Cir. 2013). This speech includes, but is not limited to, "urging citizens to register; distributing voter registration forms; helping voters to fill out their forms; and asking for information to verify that registrations were processed successfully."  *Id.* at 389 (internal quotation marks omitted).

131.    VDRs' association with Jolt and others is critical to their exercise of expressive rights.  VDRs work with Jolt because they believe in furthering Jolt's goal of increasing civic participation among Latinos in Texas, and they wish to engage in advocacy in furtherance of that goal by encouraging and helping people to register at Jolt voter registration drives.  Voters, in turn, rely on Jolt for election-related information and support with their voter registration.

132.    Disrupting Jolt's association with its VDRs would significantly impair Jolt's and its VDRs' ability to conduct voter registration drives and effectively communicate their message.

133.    The Supreme Court has recognized for decades that "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action."  *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).  That is because disclosure can subject organizations and individuals to threats of harassment, reprisals, and "other manifestations of public hostility."  *Id.*

134.    Harassment need not be certain to occur for a plaintiff to state an association claim. The Supreme Court has emphasized instead that the First Amendment is implicated "by 'state action which may have the effect of curtailing the freedom to associate,' and by the 'possible deterrent effect' of disclosure." *AFP*, 594 U.S. at 616 (emphasis in original) (quoting *NAACP*, 357 U.S. at 460–61).

135.    The disclosure need not be made public in order to infringe on associational rights. Rather, "disclosure requirements can chill association '[e]ven if there [is] no disclosure to the general public.'" *Id.* (quoting *Shelton v. Tucker*, 364 U.S. 479, 485 (1960)).

136.    Where a threatened disclosure burdens a plaintiff's association rights, courts apply at least "exacting scrutiny." *See id.* at 607 (plurality opinion). That standard "requires that there be a substantial relation between the disclosure requirement and a sufficiently important governmental interest, and that the disclosure requirement be narrowly tailored to the interest it promotes." *Id.* at 611 (majority opinion) (internal quotation marks and citation omitted). It is Defendant's burden to show that this standard has been met.

137.    Jolt and those who affiliate with it have many reasons to fear retaliation or harassment should Jolt provide Defendant with their identities.

138.    Upon information and belief, Defendant is currently undertaking a groundless campaign of intimidation against organizations and individuals involved in registering Latino citizens to vote. Associates of Jolt have every reason to fear that they will be targeted if Defendant learns of their relationship.

139.    Associates of Jolt also have reason to fear threats of violence, harassment, or other repercussions should their identities and association with Jolt become public.

140.    Defendant's discovery requests fail exacting scrutiny because their volume and breadth and the sensitivity of the information sought reveal that they are not made for any lawful purpose, let alone a sufficiently important one.  Instead, they are a baseless attempt to continue through a new procedural mechanism the same campaign of intimidation against Jolt and its employees and volunteers for engaging in constitutionally protected activity that Defendant initiated by serving Jolt with an RTE.

141.    Although the discovery requests are purportedly for the purpose of ascertaining whether the Tarrant County District Court is the proper venue for Defendant's retaliatory quo warranto proceeding, Defendant's quo warranto petition demonstrates that he initiated that proceeding without any basis for believing that any of the events giving rise to the petition occurred in Tarrant County.  Defendant has no sufficiently important interest in conducting a fishing expedition to retrospectively justify bringing the proceeding in Tarrant County.

142.    Even if the discovery requests were made for a sufficiently important interest, they are not substantially related or narrowly tailored to the putative purpose of ascertaining whether the Tarrant County District Court is the proper venue for Defendant's retaliatory quo warranto proceeding.

143.    Accordingly, Defendant's discovery requests violate the First Amendment.

### JURY TRIAL DEMANDED

144.    Jolt demands a jury trial on each and every claim related to which a jury trial is available.

## REQUEST FOR RELIEF

Jolt respectfully requests that this Court enter judgment in its favor and:

1) Declare that the Attorney General's has engaged in an unconstitutional and unlawful campaign of retaliation and intimidation against Jolt, including his filing a quo warranto action against the organization;

2) Issue a preliminary and permanent injunction enjoining the Attorney General—including his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction—from pursuing quo warranto relief against Jolt in retaliation for Jolt's First Amendment activities and to intimidate Jolt from conducting its voter-registration activities;

3) Award Jolt compensatory and punitive damages under 42 U.S.C. § 1983;

4) Award Jolt reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

5) Grant Jolt such other relief the Court deems just and proper.

Respectfully submitted this January 5th, 2026,

Mimi Marziani
Texas Bar No. 24091906
mmarziani@msgpllc.com
Joaquin Gonzalez
Texas Bar No. 24109935
jgonzalez@msgpllc.com
MARZIANI, STEVENS &
GONZALEZ PLLC

500 W. 2nd Street
Suite 1900
Austin, TX 78701
Phone: (210) 343-5604

Jonathan Backer*
Mary McCord*
Joseph Mead*
William Powell*
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY & PROTECTION
Georgetown University Law Center
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Phone: (202) 661-6671
jb2845@georgetown.edu
mbm7@georgetown.edu
jm3468@georgetown.edu
william.powell@georgetown.edu

*Attorneys for Plaintiff*

*Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 5, 2026, I electronically filed the foregoing with the Clerk of the Court and served a copy upon all counsel of record registered to receive notice via the Court's CM/ECF system.

_/s/ Jonathan L. Backer_
Jonathan Backer