IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JOLT INITIATIVE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:25-CV-1808-RP |
| | § | |
| KEN PAXTON, *in his individual and official* | § | |
| *capacity as Attorney General of Texas,* | § | |
| | § | |
| Defendant. | § | |

## ORDER

Before the Court is Plaintiff Jolt Initiative, Inc.'s ("Plaintiff") Motion for Preliminary

Injunction ("PI Motion"). (PI Motion, Dkt. 2). Defendant Ken Paxton ("Defendant") filed a

response, (Dkt. 24), to which Plaintiff replied, (Dkt. 27). The Court held a hearing on Plaintiff's PI

Motion on January 22, 2026. (Dkt. 43). The Court also considered an amicus brief filed by the

Campaign Legal Center ("CLC") in support of Plaintiff's PI Motion. (Dkt. 25). Having considered

the briefing, the evidence, and the relevant law, the Court will grant the motion.

## I. BACKGROUND

### A. Facts

Plaintiff is a nonprofit organization focused on increasing the civic participation of young

Latinos in Texas. (Declaration of Jacqueline Bastard, Dkt. 2-1, at 1). Among other activities, Plaintiff

conducts voter registration drives in Texas—primarily in Dallas, Harris, and Bexar Counties. (*Id.* at

3). To carry out its voter registration drives, Plaintiff uses Volunteer Deputy Registrars ("VDRs"),

who are either paid members of Plaintiff's staff or volunteers for the organization. (*Id.*). VDRs are

individuals certified by Texas county registrars who provide blank voter registration forms to

potential voters; walk potential voters through the process of filling out the form and answer any

questions they may have; and deliver completed forms to the county registrar. (*Id.* at 3–4). "Before

accepting another person's voter registration application, a [VDR] must complete a training program developed by the Secretary of State." (Resp., Dkt. 24, at 7) (citing Tex. Elec. Code § 13.031(e)). VDRs are required by law to deliver completed forms to the county registrar within five days. (*Id.* at 4). Tex. Elec. Code § 13.042. VDRs review the information on registration forms for completeness, but they do not have the ability or power to determine whether an applicant is actually eligible to vote. (Resp., Dkt. 24, at 7). Tex. Elec. Code § 13.039. Rather, the county registrar determines whether an applicant is eligible to be added to the voter rolls. Tex. Elec. Code § 13.072. Under the Texas Election Code, a person, including a VDR, "commits an offense if the person knowingly or intentionally . . . requests, commands, coerces, or attempts to induce another person to make a false statement on a registration application." *Id.* § 13.007(2). Plaintiff alleges that it "trains its VDRs carefully, closely monitors their work, and has several layers of quality control" and that it "do[es] all of [its] work in compliance with the letter and spirit of all laws, and in consultation with legal counsel." (Bastard Decl., Dkt. 2-1, at 3).

The parties both describe the history of Defendant's investigation into Plaintiff. First, Plaintiff cites an X post from August 18, 2024, in which a Fox News host, Maria Bartiromo, reported:

> "From a friend ... Friend of mine's wife had to take her 16 yr old son to the DMV this week for a new license. Couldn't get an online appointment(all full) so went in person and had to go to 3 DMV's to get something done. First DMV was in Weatherford. Had a massive line of immigrants getting licenses and had a tent and table outside the front door of the DMV registering them to vote! Second one was in Fort Worth with same lines and same Dems out front. Third one was in North Fort Worth had no lines but had same voter registration drive."

(Ex. 2 to PI Motion, Dkt. 2-4, at 2). Maria Bartiromo (@MariaBartiromo), X (Aug. 18, 2024, 9:56 AM), https://perma.cc/B7MD-PRKC. Plaintiff then points to an article in which a *Texas Tribune* author responded to Bartiromo's post in reporting that "[o]fficials in a North Texas county debunked claims made by a Fox News host that migrants were registering to vote outside a state

drivers license facility west of Fort Worth — an unsubstantiated claim that appeared to spark an investigation by Attorney General Ken Paxton's office." (PI Motion, Dkt. 2, at 3). Berenice Garcia, *A Fox News Host's Debunked Election Conspiracy Appears to Have Prompted a State Investigation*, Tex. Trib. (Aug. 26, 2024), https://perma.cc/9PM6-H9YS.

On August 19, 2024, Defendant represents that he sent an undercover investigator to a Texas Department of Motor Vehicles ("DMV") office in Universal City, Texas "to determine whether unlawful voter registration efforts were taking place." (Def.'s Original Quo Warranto Pet.,[1] Ex. D to Bastard Decl., Dkt. 2-1, at 33–34). According to Defendant, the investigator "made contact with" one of Plaintiff's VDRs and claimed to be "a father seeking to register his daughter, who was not with him." (*Id.*). Plaintiff and Defendant agreed at the Court's hearing on Plaintiff's PI Motion that in response to the investigator's questions, Plaintiff's VDR accurately conveyed to the investigator that Texas law allows a parent to register their eligible child to vote. (Hr'g Tr. 17:9–11; 23:3–12). Tex. Elec. Code § 13.003. Notwithstanding the fact that Plaintiff's VDR did nothing more than accurately convey what Texas law permits, the investigator filed a report inaccurately stating that Plaintiff's VDR's conduct was unlawful. (Def.'s Original Quo Warranto Pet., Ex. to Bastard Decl., Dkt. 2-1, at 33–34).

The following day, on August 20, 2024, an X user who Plaintiff alleges is a "far-right activist" posted a video on X in which he approached one of Plaintiff's VDRs outside of a Texas Department of Public Safety ("DPS") office and asked the VDR if "illegal aliens" were voting in Texas. (Ex. 1 to PI Motion, Dkt. 2-3, at 2). hernando arce (@hernandoarce), X (Aug. 20, 2024, 12:53

_____

[1] Plaintiff informed the Court in its Reply that Defendant amended his proposed quo warranto petition on December 9, 2025, and that the amended version omits reference to this undercover investigator's incident report. (Reply, Dkt. 27, at 6). Plaintiff suggested to the Court at the hearing on Plaintiff's PI Motion that Defendant's removal of one of his few alleged pieces of evidence against Plaintiff further suggests his bad faith in bringing the quo warranto action. (Hr'g Tr. 16:24–17:15). The Court agrees that the undercover investigator's report provides no evidence to credit Defendant's assertion that Plaintiff is violating the Texas Election Code.

PM), https://perma.cc/VF8G-GKMY (https://x.com/hernandoarce/status/1825954284858417 608?s=20) ("Arce Video"). Arce titled his post "Investigative Report we have Marxist non profit organizations like @JoltAction infiltrating Texas @TxDPS locations in San Antonio" and tagged Defendant's X account, among many others. (Arce Video). In the Arce Video, Plaintiff's VDR, who Plaintiff identified as "A.R.," explains how Plaintiff's VDRs assist individuals who approach their booth with filling out their applications but do not verify them because that is not part of their responsibilities. *Id.* A.R. suggests that a noncitizen could theoretically complete a voter registration application because VDRs do not ask for proof of citizenship. *Id.* A.R. also confirms that it is illegal for noncitizens to vote. *Id.*

Plaintiff then alleges that on August 21, 2024, Defendant's office announced "an investigation into reports that organizations operating in Texas may be unlawfully registering noncitizens to vote in violation of state and federal law." (PI Motion, Dkt. 2, at 3). *Attorney General Ken Paxton Launches Investigation into Reports That Organizations May Be Illegally Registering Noncitizens to Vote*, Tex. Off. Att'y Gen. (Aug. 21, 2024), https://perma.cc/EF4H-E6PP. In reaction to Defendant's investigation, Plaintiff's sister organization Jolt Action issued a statement days later criticizing Defendant for "suppress[ing] voter registration" and "attack[ing] Texans once again." (Ex. A to Bastard Decl., Dkt. 2-1, at 14).

Later that month, on August 30, 2024, Defendant issued a "Request to Examine" (RTE) to Plaintiff, which, according to Plaintiff, demanded that Plaintiff disclose confidential information, including the identities of its volunteers and other associates.[2] (PI Motion, Dkt. 2, at 4; Ex. B to

---

[2] The RTE instructed Plaintiff to provide the following categories of documents by September 19, 2024: (1) "Each of Your volunteer deputy registrars' certificates of appointment;" (2) "All Documents Jolt provides to your volunteer deputy registrars Concerning the voter registration application process;" (3) "All Documents Jolt provides to your volunteer deputy registrars Concerning Your role in the voter registration application process;" (4) "Each of the completed registration receipts created pursuant to Texas Election Code § 13.040 and maintained by You."

Bastard Decl., Dkt. 2-1). Defendant purported to issue the RTE pursuant to Texas Business Organizations Code § 12.151, which allows the Attorney General to "inspect, examine, and make copies, as the attorney general considers necessary in the performance of a power or duty of the attorney general, of any record of the entity." (Ex. B to Bastard Decl., Dkt. 2-1, at 17). Defendant's RTE instructed Plaintiff that "penalties for a legally unexcused failure or refusal to timely produce records for the Attorney General's Examination include the Office of the Attorney General initiating a legal action for the entity's 'registration or certificate of formation' to 'be revoked or terminated.'" (*Id.* at 18 (citing Tex. Bus. Org. Code § 12.155)).

On September 13, 2024, Plaintiff filed a lawsuit in this District, which was assigned to this Court, seeking a temporary restraining order and preliminary injunction to bar Defendant from enforcing his RTE. *Jolt Initiative, Inc. v. Paxton*, No. 1:24-cv-1089-RP (W.D. Tex. Sept. 13, 2024), Dkt. 2. Plaintiff alleged that Defendant's RTE violated Plaintiff's freedom of association, retaliated against Plaintiff for protected expression, and violated the Voting Rights Act because it intimidated Plaintiff for helping individuals register to vote. (*Id.* at 2). Defendant eventually voluntarily withdrew his RTE, after a series of other courts' rulings on the constitutionality of the provision of the Texas Business Organizations Code authorizing RTEs. (PI Motion, Dkt. 2, at 4; *see* Ex. 1 to Reply, Dkt. 27-1, at 2). Plaintiff asserts that due to Defendant's written assurances that he would not serve a new RTE concerning the same subject matter, Plaintiff agreed to voluntarily dismiss this case. (PI Motion, Dkt. 2, at 4). The parties submitted a joint stipulation of dismissal without prejudice under Federal Rule of Civil Procedure 41(a)(1)(A)(ii) on October 22, 2025. No. 1:24-cv-1089-RP (W.D. Tex. Oct. 22, 2025), Dkt. 38. As such, this Court closed that case on October 23, 2025. No. 1:24-cv-1089-RP (W.D. Tex. Oct. 23, 2025), Dkt. 39. That same day, Defendant filed a motion for leave to file a quo warranto action in the Tarrant County District Court seeking to revoke Plaintiff's

5

corporate charter. (Resp., Dkt. 24, at 9). *State of Texas v. Jolt Initiative, Inc.*, Cause No. 352-371410-25 (352nd Dist. Ct., Tarrant County, Tex., filed on Oct. 23, 2025).

A quo warranto action is a civil action that has historically been used to "address[] abuse of corporate charters." *Paxton v. Annunciation House, Inc.*, 719 S.W.3d 555, 567–68 (Tex. 2025), *reh'g denied* (Sept. 26, 2025). The Texas Constitution gives the Attorney General the power and duty to file quo warranto actions.[3] *Id.* at 568. This constitutional authority is also codified in Texas Civil Practice & Remedies Code § 66, which defines the appropriate grounds and standards for bringing a quo warranto action. Section 66.002(d) dictates the standard for formally initiating a quo warranto action: "If there is probable ground for the proceeding, the judge shall grant leave to file the information, order the information to be filed, and order process to be issued."

Defendant's amended quo warranto petition accuses Plaintiff of "systematically subverting the election process and violating Texas election law by recruiting, training, and directing individuals to submit false, or otherwise unlawful, voter registration applications." (Def.'s First Am. Quo Warranto Pet., Dkt. 27-2, at 1). Defendant further alleges that Plaintiff "publicly declared its resentment for Republican and Conservative political ideology" and that its "efforts are intended to unlawfully tilt elections against causes and candidates that they dislike." (*Id.*). Further, Defendant references Plaintiff's lawsuit in front of this Court—suggesting that it was an effort to "stall [Defendant's] investigation through the 2024 election"—and the parties' agreement to dismiss the lawsuit based on Defendant not re-issuing another RTE. (*Id.* at 14). Then, Defendant alleges "[t]he

---

[3] "The Attorney General shall represent the State in all suits and pleas in the Supreme Court of the State in which the State may be a party, and shall especially inquire into the charter rights of all private corporations, and from time to time, in the name of the State, take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power or demanding or collecting any species of taxes, tolls, freight or wharfage not authorized by law. He shall, whenever sufficient cause exists, seek a judicial forfeiture of such charters, unless otherwise expressly directed by law, and give legal advice in writing to the Governor and other executive officers, when requested by them, and perform such other duties as may be required by law." Tex. Const. art. IV, § 22.

State commenced this lawsuit to hold [Plaintiff] accountable for its underlying systematic and unlawful conduct and to revoke [Plaintiff's] right to transact business in Texas." (*Id.*). Plaintiff contends that "[n]othing in the quo warranto petition remotely provides any reason to believe that [Plaintiff] or its VDRs purposefully solicited false statements." (Reply, Dkt. 27, at 6).

On November 11, 2025, Defendant issued a press release announcing the filing of his quo warranto action. *Attorney General Ken Paxton Sues Radical Activist Organization for Unlawfully Registering Illegals to Vote in Texas*, Tex. Off. of Att'y Gen., (Nov. 10, 2025), https://perma.cc/NTP6-83VL (hereinafter, "Def.'s Nov. 2025 Press Release"). The press release claims Plaintiff is "orchestrating a systematic, unlawful voter registration scheme that is designed to sabotage Texas election integrity and allow illegals to vote," "knowingly attempt[ing] to corrupt our voter rolls and weaken the voice of lawful Texas voters," and "recruit[ing] and solicit[ing] individuals to submit unlawful voter registration applications, which could be designed to register illegal aliens who lack proper identification." *Id.* Defendant is quoted saying that "[a]ny organization attempting to register illegals, who are all criminals, must be completely crushed and shut down immediately." *Id.*

### B. Procedural History

On November 11, 2025, Plaintiff filed its Complaint, (Dkt. 1), and PI Motion, (Dkt. 2), in the instant case. Plaintiff's PI Motion asks this Court to enjoin Defendant from proceeding with his quo warranto action. (Dkt. 2). The briefing on Plaintiff's PI Motion concluded on December 16, 2025. On January 5, 2026, Plaintiff filed its First Amended Complaint, in which Plaintiff claims that Defendant's quo warranto action constitutes unconstitutional retaliation under the First Amendment and intimidation under the Section 11(b) of the Voting Rights Act ("VRA"), and that Defendant's discovery requests in his quo warranto action violate Plaintiff's freedom of association under the First Amendment. (Am. Compl., Dkt. 39, at 24–30).

The Court denied Defendant's Opposed Motion for Leave to Seek Expedited Discovery, (Dkt. 34), on January 8, 2026. (Dkt. 40). In its order, the Court found that Defendant's discovery requests were not narrowly tailored and would inflict great burden on Plaintiff without good cause. (*Id.* at 5). The Court also noted that it shared Plaintiff's concern that Defendant sought expedited discovery only to attempt to obtain evidence for his quo warranto action against Plaintiff rather than for good cause. (*Id.*). The Court understands that Defendant is requesting similar discovery—which according to Plaintiff is broader and more invasive than the information sought in Defendant's original RTE—in his quo warranto proceeding against Plaintiff. (Am. Compl., Dkt. 39, at 2). Plaintiff alleges that "Defendant's requests seek highly sensitive information about [Plaintiff], its employees and volunteers, and the voters with whom its employees and volunteers associate."[4] (*Id.* at 15). Plaintiff has represented to the Court that its deadline to respond to Defendant's state court discovery requests is January 29, 2026. (Pl.'s Notice, Dkt. 41, at 1).

The Court also understands that Plaintiff has moved to transfer the venue of Defendant's quo warranto proceeding from Tarrant County to Harris County and that the Tarrant County District Court will hold a hearing on that motion on February 6, 2026. (Pl.'s Resp. to Mot. Discovery, Dkt. 36, at 3 n.1). Plaintiff contends that the wrongdoing alleged by Defendant occurred in Bexar County and Plaintiff's principal office is in Harris County, "raising concerns of attempted forum shopping." (Am. Compl., Dkt. 39, at 12). Finally, while the Tarrant County District Court was originally scheduled to hold a hearing on Defendant's motion for leave to file his quo warranto petition per Texas Civil Practice & Remedies Code § 66.002(d) on January 29, 2026, that hearing is now continued according to Plaintiff's notice to the Court filed on January 14, 2026. (Dkt. 41).

---

[4] As an example, Plaintiff describes that the "propounded discovery requests demand [Plaintiff] identify the locations, dates, and times of all voter-registration drives that it has organized and the names of the VDRs who participated in each of those drives" as well as require Plaintiff to "produce other sensitive information that bears on its association activity, including its payroll information; 'rosters'; emails and text messages 'directing the activities of individuals involved with voter registration'; and tax returns." (*Id.* at 16).

## II. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy requiring a movant to "unequivocally show the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050–52 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

## III. DISCUSSION

### A. Defendant's Abstention Arguments

In Defendant's response to Plaintiff's PI Motion, Defendant argues that the *Younger v. Harris*, 401 U.S. 37 (1971), abstention doctrine precludes the Court from issuing a preliminary injunction. (Resp., Dkt. 24, at 11–15). Plaintiff counters that *Younger* does not preclude the Court from issuing a preliminary injunction for three reasons: (1) a quo warranto action is not sufficiently similar to a criminal prosecution; (2) Defendant's quo warranto action did not precede Plaintiff's litigation in federal court; (3) Defendant initiated his quo warranto action in bad faith. (Reply, Dkt. 27, at 4–5). At the hearing on Plaintiff's PI Motion, Plaintiff conceded that its second and third arguments were the strongest bases for convincing this Court that *Younger* does not preclude it from issuing a preliminary injunction. As such, the Court focuses its analysis below on the parties' arguments as to Plaintiff's second and third bases for the Court to find an exception from *Younger* abstention.

In "exceptional circumstances," *Younger* and its progeny require federal courts to refrain from enjoining certain state court proceedings.[5] *New Orleans Pub. Serv., Inc. v. City of New Orleans*, 491 U.S. 350, 367–68 (1989). *Younger* is primarily applicable to "parallel, pending state court criminal proceeding[s]," but it also covers "particular state civil proceedings that are akin to criminal prosecutions." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). Generally, a federal court must consider three factors before invoking *Younger*: (1) there must be an ongoing state court proceeding; (2) the proceedings must implicate important state interests; (3) the federal plaintiff must have had an adequate opportunity in the state court proceedings to raise constitutional challenges. *Bice v. La. Pub. Def. Bd.*, 677 F.3d 712, 716 (5th Cir. 2012).

"Where those three criteria are satisfied, a federal court may enjoin a pending state-court criminal proceeding only if: (1) the state-court proceeding was brought in bad faith or to harass the federal plaintiff; (2) the federal plaintiff seeks to challenge a state statute that is flagrantly and patently violative of express constitutional prohibitions in every clause, sentence, and paragraph, and in whatever manner and against whomever an effort might be made to apply it, or (3) where other extraordinary circumstances threaten irreparable loss [that] is both great and immediate." *Gates v. Strain*, 885 F.3d 874, 880 (5th Cir. 2018) (citations and quotations omitted). In the "extraordinary cases" in which a parallel state proceeding is covered by *Younger*, "acts in bad faith or with the purpose of harassing the federal plaintiff . . . are not legitimate activities" justifying *Younger*

---

[5] The Court also notes the addition of *Mitchum v. Foster* to this analysis—which neither party raised—in which the Supreme Court considered the applicability of the Anti-Injunction Act to cases brought in federal court under 42 U.S.C. § 1983. 407 U.S. 225 (1972). The Anti-Injunction Act provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. In *Mitchum*, the Supreme Court ruled that § 1983—the statutory authority through which Plaintiff sues Defendant for violating its constitutional rights—is "an express authorization from Congress permitting federal courts to enjoin state proceedings in order to protect federal rights." 407 U.S. at 242–43. The Fifth Circuit has determined, however, that the abstention analysis does not stop there. Rather, "§ 1983 does not qualify in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding." *Gates*, 885 F.3d at 880 (citations and quotations omitted). A federal court must then apply the *Younger* abstention doctrine. *Id.*

abstention. *DeSpain v. Johnston*, 731 F.2d 1171, 1176–77 (5th Cir. 1984) (quotations omitted). In those cases, "the balance tips in favor of the national government, and federal courts should act to protect federal interests." *Id.* (citing *Younger*, 401 U.S. at 47). "Equitable relief by the federal court is warranted, because the federal plaintiff faces a risk of irreparable injury that is both 'great and immediate.'" *Id.* (quoting *Younger*, 401 U.S. at 47)). A state "by definition does not have any legitimate interest in pursuing a bad-faith prosecution brought to retaliate for or deter the exercise of constitutionally protected rights," and "[t]he justification for comity disappears" in such circumstances. *Wilson v. Thompson*, 593 F.2d 1375, 1383 (5th Cir. 1979).

Plaintiff's second asserted basis as to why the Court is not required to abstain under *Younger* is that "proceedings of substance" have already occurred in front of this Court in Plaintiff's prior lawsuit challenging Defendant's RTE. (Reply, Dkt. 27, at 3) "*Younger* abstention is required . . . only when state court proceedings are initiated 'before any proceedings of substance on the merits have taken place in the federal court.'" *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 238 (1984) (quoting *Hicks v. Miranda*, 422 U.S. 332, 349 (1975)). Plaintiff claims that the completed preliminary injunction and motion to dismiss briefing in Plaintiff's prior lawsuit—which this Court did not rule on before the parties voluntarily dismissed the case—constitute "proceedings of substance" to except this Court from *Younger* abstention. (Reply, Dkt. 27, at 4).

Plaintiff further elucidated this point at the hearing on Plaintiff's PI Motion by focusing primarily on the idea of "reverse removal"—that Defendant has committed an ongoing course of retaliatory conduct against Plaintiff, beginning with his issuance of the RTE, that should be considered together such that Defendant should not benefit from having technically commenced his state quo warranto action before Plaintiff could file the instant case in front of this Court. Plaintiff relies on *For Your Eyes Alone, Inc. v. City of Columbus, Georgia* for this proposition, in which the Eleventh Circuit—in evaluating a series of arguments about *Younger* abstention—cautioned against

the possibility of creating "an expansive '*reverse removal power*' in [which] state prosecutors, in effect, would have broad discretion to remove federal civil rights actions to state criminal court on a routine basis, even after the plaintiff had invested precious time and resources to bringing the federal litigation." 281 F.3d 1209, 1219 (11th Cir. 2002) (emphasis in original). Plaintiff contends that it expended significant time and resources to litigate its first lawsuit in front of this Court before the parties agreed to voluntarily dismiss the case, based on Defendant's assurance that his Office would not re-issue the RTE. (Hr'g Tr. 12:11–13; *see* Ex. 1 to Reply, Dkt. 27-1, at 2).

In response to this argument from Plaintiff at the hearing, Defendant conceded that his "ultimate goal" has been to "sanction Jolt," and that he agreed to not re-issue a RTE in Plaintiff's first case in front of this Court because his Office believed they had the evidence sufficient to meet the probable grounds standard to go forward with filing a quo warranto action to meet their "ultimate goal." (Hr'g Tr. 18:23–24; 20:12–21:5). This concession demonstrates that Defendant's actions—including those pertaining to Plaintiff's first lawsuit in front of this Court—constitute an ongoing, intentional course of conduct. Guided by the Eleventh Circuit's warning, the Court finds that Defendant should not get the benefit of attempting to abuse a "reverse removal power" by arguing for abstention. *See For Your Eyes Alone*, 281 F.3d at 1219. The Court is therefore persuaded by Plaintiff's argument that "proceedings of substance" have occurred here such that the Court may not abstain under *Younger*. *See Haw. Housing Auth.*, 467 U.S. at 238; *Hicks*, 422 U.S. at 349. *See also DeSpain*, 731 F.2d at 1179 ("More difficult [*Younger* abstention] issues are presented when the federal filing precedes the initiation of the state proceeding. In such cases, the federal court should abstain if the state proceeding is begun before any federal 'proceedings of substance on the merits' have taken place. The determinative factor, 'proceedings of substance,' has not been judicially defined.") (citation omitted).

The Court also finds, however, that Defendant initiated his quo warranto action in bad faith, which provides an additional basis by which the Court must not abstain under *Younger*. *See DeSpain*, 731 at 1176–77. "[I]n exceptional cases in which a state prosecutor is credibly accused of bad faith and has no reasonable hope of obtaining a valid conviction against the defendant, comity-infused deference gives way, and a federal court may exercise its equitable power to enjoin the prosecution." *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1085 (5th Cir. 2023). The Fifth Circuit also found that in these exceptional cases the federal plaintiff—or, the defendant in the state's case—does not "have an adequate opportunity to assert constitutional violations in the state proceeding when the prosecution *itself* is the constitutional violation," meaning that the federal court may not abstain under *Younger* per the three factors outlined in *Bice v. La. Pub. Def. Bd. Netflix*, 88 F.4th at 1085 (emphasis in original); *Bice*, 677 F.3d at 716.

The Court does not come to this conclusion lightly, considering that the Fifth Circuit has stated that "the bad faith exception is narrow and is to be granted parsimoniously." *Wightman v. Tex. Sup. Ct.*, 84 F.3d 188, 190 (5th Cir. 1996) (citing *Hefner v. Alexander*, 779 F.2d 277 (5th Cir. 1985)). The Court is convinced, however, that Plaintiff has met its burden to prove that Defendant is acting in bad faith. Given multiple opportunities to assert his *good* faith by pointing to any credible evidence of illegal activity or even general wrongdoing by Plaintiff, its staff, or its volunteers, Defendant could not offer any plausible proof in either his briefing or at the hearing.

Plaintiff argued both in its briefing and at the hearing that Defendant initiated his quo warranto action in bad faith based on several indicia deemed relevant to the *Younger* bad-faith exception analysis in *Netflix, Inc. v. Babin*. Plaintiff contends that Defendant's quo warranto action meets various indicia of bad faith including, most significantly, the complete lack of credible evidence of illegal activity conducted by Plaintiff, suggesting that Defendant has "no hope of obtaining a valid" outcome in his favor, and also the timeline of events at issue and Defendant's

"multiplicity of prosecutions," or as the Fifth Circuit called it, "upping the ante." *See Netflix*, 88 F.4th at 1091–93.

First, the Court agrees with Plaintiff that, even taking Defendant's allegations as true, there are no alleged violations of law committed by Plaintiff in Defendant's amended quo warranto petition. (*See* Def.'s First Am. Quo Warranto Pet., Dkt. 27-2). When given multiple chances at the hearing to demonstrate how Defendant has a hope of succeeding in his quo warranto action, Defendant could point only to "the inference taken from the hypothetical" posited to Plaintiff's VDR A.R. in the Arce Video; the fact that Plaintiff holds voter registration drives outside of DMV offices[6]; and vague "social media posts." (Hr'g Tr. 31:1–23; 25:25). Defendant's basis for bringing the quo warranto action is that Plaintiff is purportedly inducing false statements in violation of the Texas Election Code § 13.007(a)(2), which prohibits "knowingly or intentionally . . . request[ing], command[ing], coerc[ing], or attempt[ing] to induce another person to make a false statement on a registration application." (Def.'s First Am. Quo Warranto Pet., Dkt. 27-2, at 15). Yet, Defendant cannot point to any credible evidence that any of Plaintiff's staff or volunteers have committed conduct that even comes close to that described in § 13.007(a)(2). In fact, in the Arce Video, Plaintiff's VDR A.R. confirms that it is illegal for noncitizens to vote in U.S. elections; states that he has never encountered a noncitizen attempting to register but such an individual theoretically could if they "really wanted to" because VDRs check only for completeness not accuracy; and, importantly, does not assist anyone with voter registration, given that Arce said at the outset that he is already registered to vote. (Arce Video at 0:13–16, 0:25–55, 1:25–33). And, Plaintiff's frequent positioning of voter registration drives outside of DMV offices is not only quite sensical and justifiable but also entirely legal.

---

[6] The parties refer to DPS and DMV offices seemingly interchangeably in their briefing and exhibits to describe the government buildings outside of which Plaintiff frequently hosts voter registration drives. For consistency, the Court will refer to these government buildings as "DMV offices" from this point forward.

Plaintiff also points to the similarities in timeline of how Defendant's conduct compares to that in *Netflix*, where the Fifth Circuit affirmed the district court's refusal to abstain on *Younger* grounds. (Reply, Dkt. 27, at 8). In *Netflix*, the state prosecutor—who had already subjected the federal plaintiff Netflix to an investigation that had sat largely idle for approximately a year— "abruptly" brought four new indictments after "Netflix's assertion of its First Amendment rights" in a habeas petition filed in federal court. (*Id.* (quoting *Netflix*, 88 F.4th at 1092)). The district court identified this "multiplicity of prosecutions" as a "hallmark of bad faith," particularly since the prosecutor "upp[ed] the ante" by bringing the new charges "under a more severe criminal statute." (*Id.* (quoting *Netflix*, 88 F.4th at 1093)). Here, Plaintiff contends "Defendant has repeatedly escalated his retaliatory campaign against [Plaintiff] despite failing to turn up any evidence of wrongdoing and despite [Plaintiff's] detailed explanations in the prior federal litigation disproving Defendant's theories." (*Id.*). Further, Plaintiff asserts that Defendant's initiation of his quo warranto proceeding "immediately upon securing the voluntary dismissal of the federal case based on assurances that he would not serve another RTE on [Plaintiff]" "suggests a desire to avoid federal oversight of [Plaintiff's] assertion of its First Amendment rights and Voting Rights Act safeguards." (*Id.* (citation and quotations omitted)). And, the penalties for failure or refusal to produce records in response to a RTE include the Attorney General's office initiating legal action for the entity's "registration or certificate of formation" to "be revoked or terminated," as Defendant's RTE to Plaintiff warned. (Ex. B to Bastard Decl., Dkt. 2-1, at 18 (citing Tex. Bus. Org. Code § 12.155)). This suggests that Defendant did "up the ante" in his investigation of Plaintiff. *See Netflix*, 88 F.4th at 1093.

Plaintiff's demonstrations of how Defendant "upped the ante" by using a multiplicity of enforcement tools on an accelerated timeline—"escalating from an RTE to the more severe quo warranto action" even without finding any new evidence to suggest wrongdoing by Plaintiff—are convincing indicia of Defendant's bad faith. (*Id.* (citation and quotations omitted)). For the reasons

stated above, the Court is convinced, at this stage, that Defendant brings his quo warranto action "without hope of obtaining a valid" outcome in his favor. *See Netflix*, 88 F.4th at 1091. Therefore, the Court may not decline to reach Plaintiff's request for a preliminary injunction on the grounds of the *Younger* abstention doctrine.

## B. Plaintiff's Preliminary Injunction Motion

Plaintiff argues that Defendant's filing of his quo warranto action unconstitutionally retaliates against Plaintiff for engaging in activity protected by the First Amendment and that Section 11(b) of the VRA prohibits Defendant from seeking to revoke Plaintiff's corporate charter. (PI Motion, Dkt. 2, at 5, 19). As such, Plaintiff asks the Court to enjoin Defendant from proceeding with his quo warranto action in state court. The Court finds that Plaintiff has met its burden on all four factors for seeking a preliminary injunction and therefore will grant Plaintiff's PI Motion.

### 1. Likelihood of Success on the Merits

### a. First Amendment Retaliation

To state a claim for retaliation, plaintiffs "must show that (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). Plaintiff contends that each of those elements is satisfied here, and the Court agrees. (PI Motion, Dkt. 2, at 6). The Court also finds that because *Younger*'s bad-faith exception applies, Plaintiff has necessarily established a likelihood of success on the merits of its First Amendment retaliation claim. *See Wilson*, 593 F.2d at 1384–85. "Where the allegation is that the state proceedings . . . were instituted in retaliation for or to deter the exercise of constitutionally protected rights, the question of the applicability of the *Younger* exception and that of the existence of a constitutional violation merge: to

16

prove one is to prove the other." *Id.* at 1385 n.17. But, for the sake of completeness, the Court will still fully evaluate this first factor of the preliminary injunction analysis.

Plaintiff engaged in two forms of activity protected by the First Amendment: (1) its voter registration efforts, which constitute core political speech, and (2) its prior lawsuit challenging Defendant's RTE, which implicates its right to petition the government for redress of grievances. Plaintiff's voter registration activities involve quintessential First Amendment expression which the Supreme Court has described as "core political speech." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014). Plaintiff alleges that it "exists to support the Latino community and to encourage [Latino] communities to get out and vote in record numbers." (Bastard Decl., Dkt. 2-1, at 2). In *Voting for America, Inc. v. Steen*, the Fifth Circuit described several components of voter registration in Texas—including "urging citizens to register; distributing voter registration forms; helping voters to fill out their forms; and asking for information to verify that registrations were processed successfully"—as "constitutionally protected speech." 732 F.3d 382, 389–90 (5th Cir. 2013). Indeed, the Fifth Circuit said explicitly in that case that "voter registration drives involve core protected speech." (*Id.* at 390).

Defendant argues that Plaintiff was engaged in an unprotected activity of "maintaining a suspected policy of accepting voter registration applications from illegal aliens." (Resp., Dkt. 24, at 16). For the reasons stated above in the Court's analysis of the *Younger* bad-faith exception, the Court finds Defendant's accusation is baseless, and notes that Defendant himself admits that "[i]t is axiomatic in American law that some voter registration activities involve constitutionally protected speech, such as urging citizens to register; distributing voter registration forms; helping voters fill out their forms; and asking for information to verify that registrations were processed successfully." (*Id.* (citing *Voting for America*, 732 F.3d at 389)). Defendant has not provided any credible evidence

suggesting that Plaintiff's VDRs were engaged in any other voter registration activities other than those constitutionally protected ones he lists.

Having been persuaded that Plaintiff's voter registration efforts constitute core political speech, the Court also finds that Plaintiff's filing of its prior lawsuit against Defendant is activity protected by the First Amendment. "It is by now well established that access to the courts is protected by the First Amendment right to petition for redress of grievances." *Wilson v. Thompson*, 593 F.2d 1375, 1387 (5th Cir. 1979) (first citing *NAACP v. Button*, 371 U.S. 415, 429-30 (1963); and then citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972)); *Lehman v. Guinn*, 762 F. Supp. 3d 498, 504 (W.D. La. 2025) ("Filing a lawsuit against a local government is a First Amendment-protected activity.").

The Court also finds that Defendant's quo warranto action, which Plaintiff alleges "threatens [its] very existence," would chill a person of ordinary firmness. (PI Motion, Dkt. 2, at 8). Defendant's quo warranto action seeks "forfeiture of JOLT's rights and privileges as a registered corporation"; "dissolution of JOLT's corporate registration and corporate charter"; "appointment of a receiver to wind up JOLT's corporate affairs"; and payment of attorneys' fees and litigation costs." (*Id.* at 7–8). It also "operates as a notice of lien on all JOLT property in the State of Texas." (*Id.* at 8). The Fifth Circuit has held that criminal proceedings are sufficient to chill a person of ordinary firmness from exercising their First Amendment rights. *See, e.g.*, *Bailey v. Iles*, 87 F.4th 275, 289 (5th Cir. 2023); *Brooks v. City of West Point*, 639 Fed. App'x 986, 989 (5th Cir. 2016). Although civil procedures govern quo warranto proceedings, they have "quasi-criminal origins." *Annunciation House*, 719 S.W.3d at 580. Plaintiff argues that "the severity of the injury that quo warranto proceedings inflict is akin to criminal penalties that can be imposed upon a corporate entity because revocation of a corporate charter amounts to an organizational death sentence" and therefore Defendant's quo warranto action carries a substantial chilling effect. (PI Motion, Dkt. 2, at 8). Defendant, in his

abstention arguments, states that "[t]here can be no doubt . . . that the Quo Warranto Action is one of the 'civil enforcement proceedings akin to criminal prosecutions'" that *Younger* applies to. (Resp., Dkt. 24, at 12 (citing *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 623–28 (1986)). Therefore, the Court is confident that Defendant's quo warranto action is sufficiently similar to a criminal proceeding as to chill a person of ordinary firmness from exercising their First Amendment rights, per Fifth Circuit precedent. *See Bailey*, 87 F.4th at 289; *Brooks*, 639 Fed. App'x at 989.

Finally, Plaintiff alleges that "Defendant's quo warranto action was motivated by [Plaintiff's] protected activities—the organization of Latinos, the encouragement of voter registration, and the filing of the prior federal lawsuit challenging the RTE." (PI Motion, Dkt. 2, at 10). To succeed on a First Amendment retaliation claim, "a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 259 (2006)). The retaliatory motive "must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 399. In "ordinary" retaliation cases, *see Hartman*, 547 U.S. at 259, the plaintiff first must show that its constitutionally protected conduct was a "substantial factor" for the adverse action, and the burden then shifts to the defendant to show "by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The Court finds that even if this case is considered a retaliatory prosecution, there is no attenuation in the causal chain between Defendant and Plaintiff; therefore, the Court declines to reach the parties' arguments as to whether plaintiff needed to "plead and prove the absence of probable cause." *See Hartman*, 547 U.S. at 263. Additionally, the Fifth Circuit lowered the standard for showing a likelihood of success on the merits for a First Amendment retaliation claim at the

19

preliminary injunction stage—thus, Plaintiff need only show that Defendant's retaliation was motivated "at least in part" by Plaintiff's protected activities. *Netflix*, 88 F.4th at 1096. The Court finds that Plaintiff has met its burden under either standard.

Plaintiff contends that "Defendant's quo warranto action is retaliatory on its face" largely because "the petition includes a section explicitly stating that Defendant filed the quo warranto petition because of [Plaintiff's] prior federal lawsuit, under a heading stating that 'the State attempted further investigation and JOLT sued to prevent such efforts.'" (PI Motion, Dkt. 2, at 11 (citing Def.'s Original Quo Warranto Pet., Dkt 2-1, at 36)). Plaintiff further cites to that section of Defendant's original quo warranto petition[7] where Defendant states: "[T]he State now commences this lawsuit to hold JOLT accountable for its underlying systematic and unlawful conduct and to revoke JOLT's right to transact business in Texas." (*Id.* (citing Def.'s Original Quo Warranto Pet., Dkt 2-1, at 36)). Plaintiff also alleges that the quo warranto petition indicates that "Defendant was motivated by animus toward [Plaintiff's] expressive activities, including its voter registration efforts" by faulting Plaintiff for "divisive rhetoric" and alleging that Plaintiff "continually criticizes and demonizes the election of Republican and Conservative politicians, such as President Donald J. Trump." (*Id.* (citing Def.'s Original Quo Warranto Pet., Dkt 2-1, at 32)). Defendant rebuts Plaintiff's allegations by claims that "the references to [Plaintiff's] partisan preferences merely illustrate the potential motive behind Jolt's potential illegal voter registration efforts—to unlawfully tilt elections against causes and candidates that they dislike." (Resp., Dkt. 24, at 18 (quotations omitted)).

Defendant further argues that his quo warranto action was initiated "due to [Plaintiff's] potential illegal activity and the State's need to investigate [it]." (Resp., Dkt. 24, at 17). In his

---

[7] As previously discussed, Defendant amended his quo warranto petition on December 9, 2025, but this language remains in the amended petition with minor alteration. (*See* Def.'s Am. Quo Warranto Pet., Dkt. 27-2, at 14) ("The State commenced this lawsuit to hold JOLT accountable for its underlying systematic and unlawful conduct and to revoke JOLT's right to transact business in Texas.").

briefing, Defendant denies that Plaintiff's prior lawsuit in front of this Court affected his decision to file the quo warranto action. (*Id.*). Rather, he claims, "the State filed the Quo Warranto Action to investigate [Plaintiff's] potential illegal activities because the agreement borne out of [Plaintiff's] prior suit left the State with no alternative avenue for discovery and investigation." (*Id.* at 17–18). However, as the Court understands it, Defendant could have re-issued a RTE to Plaintiff or taken a variety of other steps to determine the accuracy of his suspicions as to Plaintiff's activity. Instead, Defendant assured Plaintiff his Office would not re-file a RTE but then filed his quo warranto action in state court on the exact same day this Court closed the parties' settled matter—which Plaintiff only agreed to because of Defendant's written assurances about the RTE. (Reply, Dkt. 27, at 6; Ex. 1 to Reply, Dkt. 27-1, at 2). Defendant, therefore, did have an "alternative avenue for discovery and investigation." (*See* Resp., Dkt. 24, at 18). Further, Defendant conceded at the hearing on the PI Motion that he made those assurances specifically because he believed he had sufficient evidence to then go forward with his "ultimate goal" of initiating a quo warranto action. (Hr'g Tr. 20:13–21:5). The Court finds that Defendant has not provided any credible grounds to confirm that his filing of a quo warranto action was as a result of anything other than Plaintiff's constitutionally protected conduct. *See Mt. Healthy*, 429 U.S. at 287. Rather, the events leading up to the instant case strongly suggest that Defendant seeks to revoke Plaintiff's corporate charter due to Plaintiff's constitutionally protected political speech.

The Court is particularly troubled by the fact that Defendant repeatedly cites to Plaintiff's frequent voter registration drives outside of Texas DMV offices and claims that Plaintiff's decision to conduct voter registration efforts there "illuminates [Plaintiff's] unlawful motive . . . because U.S. citizens can already register to vote at any DMV with proof of citizenship." (Def.'s Am. Quo Warranto Pet., Dkt. 27-2, at 12). Defendant suggests that because "[v]oter registration applications allow an individual to apply for registration without a state-issued ID or social security number by

simply stating that one has never been issued such an ID," "the unique positioning decisions of [Plaintiff's] VDRs, mere steps outside of DPS locations, present an opportunity for a noncitizen who wishes to submit a voter registration application." (Resp., Dkt. 24, at 8). As described earlier, this allegation supposes absolutely no wrongdoing by Plaintiff; instead, it suggests to the Court that Defendant is harassing Plaintiff and fishing for reasons to investigate its organization. Defendant does not, and cannot, contend that VDRs have any power nor authority to actually register an individual to vote. (Resp., Dkt. 24, at 8 ("The VDR is vested with the power to distribute voter registration applications, receive registration applications, accept those applications and transmit them to the registrar, and review registration applications for completeness")). Therefore, Defendant's allegations about the locations of Plaintiff's voter registration drives spurring illegal activity are both hollow and entirely implausible. Defendant also conceded at the hearing that no wrongdoing occurred nor was reported during the Arce Video—indeed, all that Defendant could represent is that he took an "inference" from the hypothetical posited to Plaintiff's VDR A.R. (Hr'g Tr. 31:1–3).

Because the Court concludes that Plaintiff's constitutionally protected activity was the but-for cause of Defendant's filing his quo warranto action, and that Defendant cannot show otherwise, the Court finds that Plaintiff has satisfied the causation element of its First Amendment retaliation claim. As such, the Court is confident that Plaintiff is likely to succeed on the merits of its First Amendment retaliation claim.

### b. Section 11(b) of the Voting Rights Act

Section 11(b) of the VRA provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote." 52 U.S.C.

§ 10307(b) ("§ 11(b)"). Plaintiff alleges that "Defendant's retaliatory campaign against [Plaintiff], starting with the prior investigation and RTE and continuing through the filing of the quo warranto action, are classic examples of the kinds of 'official acts of harassment' that § 11(b) prohibits." (PI Motion, Dkt. 2, at 19). Defendant argues that his "legitimate attempts to enforce election law" through "a narrowly tailored enforcement action to investigate and sanction wrongdoing" does not constitute harassment or intimidation as defined under § 11(b). (Resp., Dkt. 24, at 21–22).

The Fifth Circuit has interpreted § 11(b) to mean that Congress "prohibited anyone from intimidating, threatening, or coercing" those "assisting others to vote."[8] *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968). This prohibition extends to "official acts of harassment" by the state. *Id.* The Fifth Circuit has also recognized that "[t]he right to vote encompasses the right to register" and therefore "[r]egistration is a critical, inseparable part of the electoral process." *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) (cleaned up).

The Court finds other courts' interpretations of § 11(b) persuasive here as well. For example, a district court in the Southern District of New York found that "Section 11(b)'s reach is extensive" and that its protections extend "to not just voting, but to other voting-related conduct, including, for example, encouraging others to vote or helping register other voters." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 476 (S.D.N.Y. 2020). That court further found that § 11(b) does not prohibit only threats of "violence or bodily harm," but that "threats of economic harm, legal action, dissemination of personal information, and surveillance can qualify depending on the circumstances." *Id.* at 477. A district court in the Northen District of California also recently held that § 11(b) "is broad and protects both the right to vote and the right to urge others to vote."

---

[8] Amicus CLC also provides a lengthy history to substantiate its argument that "Congress's intent to protect the rights of voter organizations from intimidation via state interference with voter assistance activities is evident throughout the history of the [VRA]'s passage and reauthorization." (CLC Amicus Brief, Dkt. 25, at 9–12). The Court finds CLC's arguments as to the legislative history of § 11(b) of the VRA convincing.

*Kennedy v. Meta Platforms, Inc.*, No. 3:24-CV-02869-WHO, 2024 WL 4031486, at *6 (N.D. Cal. Sept. 3, 2024). Additionally, a district court in the Eastern District of Virginia found in a case where "Defendants ha[d] linked Plaintiffs' names and personal information to a report condemning felonious voter registration in a clear effort to subject the named individuals to public opprobrium," "Plaintiffs [had] alleged, plausibly, that the . . . reports put them in fear of harassment and interference with their right to vote" and therefore "alleged intimidation sufficient to support their § 11(b) claim." *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) (citing *Damon v. Hukowitz*, 964 F. Supp. 2d 120, 149 (D. Mass. 2013)) ("Intimidation means putting a person in fear for the purpose of compelling or deterring his or her conduct.") (citations omitted).

The Court is persuaded by the discussed opinions and finds that the parties' representations about Defendant's actions convey that Plaintiff has shown a likelihood of success on its claim that Defendant is intimidating Plaintiff within the meaning of § 11(b). Defendant's actions taken against Plaintiff have chilled Plaintiff's expressive activity and hampered its efforts to assist others in registering to vote. Plaintiff has alleged that it fears Defendant will target its VDRs "for baseless intimidation and harassment, as he has done with others" if Plaintiff is forced to provide the confidential information Defendant seeks in discovery in his quo warranto action. (Bastard Decl., Dkt. 2-1, at 7). Similarly, Plaintiff fears that if forced to disclose the identities of voters it has successfully helped register, Defendant "would try to intimidate or scare them and try to deter them from exercising their right to vote." (*Id.* at 7–8). Further, Defendant has publicly expressed that he seeks to "crush" Plaintiff in his quo warranto action. (Def.'s Nov. 2025 Press Release). Indeed, if Defendant's quo warranto action is successful, Plaintiff's corporate charter will be revoked, and it will be entirely unable to assist others in voting—which is Defendant's admitted "ultimate goal." (Hr'g Tr. 18:23–24; 20:12–21:5). And, once again, Defendant has not convinced the Court that his

actions are "legitimate attempts to enforce election law." (Resp., Dkt. 24, at 21–22). Therefore, the Court finds that Defendant's actions sufficiently constitute intimidation under § 11(b).

### 2. Remaining Preliminary Injunction Factors

The Court finds that the remaining factors for granting a preliminary injunction weigh in Plaintiff's favor. Given the Court's findings that Defendant has subjected Plaintiff to a quo warranto action in bad faith and that Plaintiff has shown a likelihood of success on its First Amendment claims, Plaintiff has also shown a likelihood of irreparable harm. *Netflix*, 88 F.4th at 1099–100 ("Netflix has shown at this stage that it has been subjected to a bad-faith prosecution, an injury we have already deemed irreparable. Netflix need not establish any further constitutional injury, like the chill of its speech.") (citation omitted); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Additionally, Plaintiff alleges that Defendant's actions have "inflicted and continue[] to inflict a host of other concrete harms on [Plaintiff]," including harming Plaintiff's reputation with its peer organizations and partners; causing Plaintiff to divert its resources from voter-registration activities including to conduct "ongoing training on safety and how to deescalate situations in the field"; forcing Plaintiff to incur additional costs; and reducing Plaintiff's fundraising levels, which in turn has forced Plaintiff to lay off staff, resulting in a significant reduction in the number of voters Plaintiff registers. (Bastard Decl., Dkt. 2-1, at 10–12). Plaintiff contends that "[i]n a typical year without statewide or federal elections, [Plaintiff] usually registers over 12,000 voters; in 2025, it has registered only about 3,500 voters." (*Id.* at 12). Finally, the Court is further convinced Plaintiff has shown a likelihood of irreparable harm because if Defendant is successful in his quo warranto action, Plaintiff will lose its right to exist as a corporation in Texas.

Defendant argues that enjoining him from proceeding with the quo warranto action would severely harm Texas in two ways: first, it would "hamstring Texas's ability to enforce election laws statewide," and second, "Texas would experience harm because, due to [Plaintiff's] alleged activity, there is a probability that ineligible persons are registering to vote on [Plaintiff's] watch." (Resp., Dkt. 24, at 23). The Court is not convinced that "Texas will certainly suffer irreparable harm in the event the State is precluded from enforcing its laws," given that Defendant is unable to provide the Court with any credible evidence of illegal activity conducted by Plaintiff, its staff, or its volunteers, and that Texas country registrars add individuals to the voter rolls, not VDRs. (*Id.* at 22–23).

The third and fourth factors for granting a preliminary injunction—the balance of the equities and the public interest, respectively—merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). With respect to the balance of the equities, Plaintiff has "an obvious interest in the continued exercise of its First Amendment rights, and [Defendant] has no legitimate interest in" retaliating against Plaintiff. *See Netflix*, 88 F.4th at 1100. Further, "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (citation omitted). The Court also applies this logic in concluding that Plaintiff has a more obvious interest in assisting others with registering to vote than Defendant does in intimidating, threatening, or coercing Plaintiff, and the public interest favors preventing voter intimidation within the meaning of § 11(b) of the VRA. Defendant claims that it is not in the public interest for the "important state interest in election integrity" to be "hamstr[u]ng" by the preliminary injunction Plaintiff seeks. (Resp., Dkt. 24, at 23). Because the Court has found that Plaintiff has shown a substantial likelihood of success on the merits of its First Amendment retaliation and § 11(b) claims and that Defendant has presented no evidence to credibly suggest that Texas's election integrity is at risk, the Court finds that an injunction is in the public interest.

### IV. CONCLUSION

Plaintiff has met its burden to show that Defendant's quo warranto action warrants a preliminary injunction enjoining Defendant from proceeding with that action in Texas state court.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Preliminary Injunction, (Dkt. 2), is **GRANTED**.

   **IT IS FURTHER ORDERED** that Defendant Ken Paxton, in his official capacity as Attorney General of Texas and his individual capacity, including his officers, officials, agents, employees, and any other persons or entities acting on his behalf, is preliminarily **ENJOINED** from proceeding with his quo warranto action, Cause No. 352-371410-25, in Texas state court.

   **SIGNED** on January 29, 2026.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE