# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

|  |  |
|---|---|
| JOLT INITIATIVE, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> KEN PAXTON, in his individual and official capacity as Attorney General of Texas, <br><br> *Defendant*. | Case No.: 1:25-cv-001808 |

## <u>PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S AMENDED MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

BACKGROUND ...........................................................................................................................1

LEGAL STANDARD ....................................................................................................................4

ARGUMENT .................................................................................................................................4

    I.    This Court Properly Declined to Abstain on *Younger* Grounds. .........................................4

    II.    Jolt Has Stated a Claim Under § 11(b) of the VRA. .........................................................5

    III.    Jolt Has Stated a First Amendment Associational Claim. ...............................................9

    IV.    Defendant's Immunity Arguments Fail. .........................................................................14

        A.    Most of Defendant's Immunity Arguments Fail at the Threshold. ..............................14

        B.    Defendant Is Not Entitled to Qualified Immunity on Jolt's First Amendment Retaliation Claim.15

CONCLUSION.............................................................................................................................20

CERTIFICATE OF SERVICE.....................................................................................................22

## INTRODUCTION

This case concerns Defendant Attorney General Ken Paxton's campaign of retaliation against Plaintiff Jolt Initiative, Inc. (Jolt) for its First Amendment-protected voter-registration activity and its filing of a prior federal lawsuit against Defendant, *Jolt Initiative, Inc. v. Paxton* (*Jolt I*), No. 1:24-1089 (W.D. Tex.). Defendant's amended motion to dismiss reprises the same arguments for abstention under *Younger v. Harris*, 401 U.S. 37 (1971), that this Court rejected in granting Jolt's preliminary-injunction motion. *See* PI Order 9–16, ECF No. 44. In addition, Defendant argues that Jolt has failed to state a claim for voting intimidation under § 11(b) of the Voting Rights Act (VRA), 52 U.S.C. § 10307(b), and that he is entitled to sovereign and qualified immunity from damages for violating Jolt's First Amendment rights. Those arguments are all meritless.

## BACKGROUND

Jolt is a 501(c)(3) nonprofit organization, incorporated in Texas, that seeks to increase the civic participation of Latinos in Texas to build a stronger democracy. Am. Compl. ¶ 1, ECF No. 39. Jolt conducts voter-registration drives, *id.* ¶ 20, and encourages Latinos in Texas to vote through public education campaigns, leadership programming, and other measures, *id.* ¶¶ 17, 19. Jolt also speaks out on issues that matter to Latinos in Texas. *Id.* ¶ 18. In these efforts, Jolt ensures that its staff and community volunteers conduct nonpartisan voter registration in accordance with state law. *Id.* ¶ 30.

Many Jolt employees and volunteers are Volunteer Deputy Registrars (VDRs) who are authorized under state law to handle voter-registration forms. *See id.* ¶¶ 22–23. At Jolt registration drives, VDRs explain the eligibility requirements to those interested in registering to vote, answer any questions, and walk them through the process of filling out a voter-registration form. *Id.* ¶ 29. VDRs then deposit completed registration forms with the county registrar. *See id.* ¶ 26.

1

On August 18, 2024, a television personality with a history of promoting conspiracy theories posted on X that people who were ineligible to vote were being registered at locations in North Texas. *Id.* ¶ 31; *see also* Maria Bartiromo (@MariaBartiromo), X (Aug. 18, 2024, 9:56 AM), https://perma.cc/B7MD-PRKC. Two days later, a far-right activist posted a video on X in which he confronted a Jolt VDR outside of a Texas Department of Public Safety (DPS) office and asked the VDR questions about whether noncitizens are able to register to vote that he answered truthfully and accurately. Am. Compl. ¶ 36.[1]

The next day, Defendant announced "an investigation into reports that organizations operating in Texas may be unlawfully registering noncitizens to vote in violation of state and federal law." Am. Compl. ¶ 40. Defendant specifically "call[ed] into question the motives of the nonprofit groups" that register voters outside of DPS offices. *Id.* Jolt's sister organization, Jolt Action, Inc., issued a statement days later criticizing Defendant for "suppress[ing] voter registration" and "attack[ing] Texans once again." *Id.* ¶ 43 (alterations in original).

Shortly thereafter, Defendant issued a request to examine (RTE) to Jolt demanding four categories of documents: (1) certificates of appointment for Jolt's VDRs; (2) documents that Jolt provides to its VDRs concerning voter registration; (3) documents that Jolt provides to its VDRs concerning Jolt's role in voter registration; and (4) receipts for completed registration applications. *Id.* ¶ 47; *see also* RTE 6, Am. Compl. Ex. A, ECF No. 39-1. Because Jolt reasonably feared that turning over such sensitive information to Defendant would expose its employees and volunteers to further harassment and intimidation and jeopardize Jolt's voter-registration work, Jolt filed a federal lawsuit challenging the RTE under the First and Fourth Amendments to the United States Constitution and

---

[1] *See also* Video posted by hernando arce (@hernandoarce), X (Aug. 20, 2024, 1:53 PM), https://x.com/hernandoarce/status/1825954284858417608.

under § 11(b) of the Voting Rights Act.  Am. Compl. ¶ 52.  Rather than defend the legality of the RTE in federal court, Defendant withdrew the RTE and promised not to serve another RTE concerning the same subject matter.  *Id.* ¶ 54.  Based on those representations, Defendant secured Jolt's agreement to voluntarily dismiss its case.  *Id.*  The Court therefore closed Jolt's case on October 23, 2025.  *Id.* ¶ 55.

That same day, Defendant filed a motion for leave to file an original petition and information in the nature of quo warranto, Am. Compl. Ex. B, along with a proposed quo warranto petition, Am. Compl. Ex. C ("Pet."), in the District Court of Tarrant County, Texas.  The quo warranto petition relies on the same allegations that Paxton previously invoked in support of the RTE and that Jolt refuted in the prior litigation.  Am. Compl. ¶ 57.  It presents nothing new, aside from partisan rhetoric alleging that Jolt is "divisive" and "devious."  Pet. 4, 7.  "The purpose of a quo warranto proceeding is to question the right of a person or corporation, including a municipality, to exercise a public franchise or office."  *In re Dallas Cnty.*, 697 S.W.3d 142, 152 (Tex. 2024) (citation omitted).  Through such proceedings, the Texas Attorney General may seek judicial forfeiture of a corporation's charter.  Tex. Const. art. IV, § 22.

In light of this existential threat, Jolt brought this lawsuit seeking declaratory and injunctive relief barring Defendant from further pursuing his quo warranto action.  Jolt also sought money damages for the past and ongoing harms that Defendant's campaign of reprisal has inflicted.  Contemporaneously with the filing of the complaint, Jolt moved for a preliminary injunction.  Before the Court could rule on that motion, Defendant served sweeping and invasive discovery requests in connection with the state-court proceeding for the putative purpose of ascertaining the proper venue for the proceeding.  Am. Compl. ¶ 67; *see also* Disc. Reqs., Am. Compl. Ex. E, ECF No. 39-5.  The propounded discovery contains requests for production that are similar to, and in some important

respects broader than, requests in Defendant's voluntarily withdrawn RTE that Jolt challenged in *Jolt I*, seeking disclosure of Jolt's associations with employees, volunteers, and voters. Am. Compl. ¶¶ 72–73. Jolt therefore amended its complaint to add a claim that the discovery requests violate its freedom of association under the First Amendment. *Id.* ¶¶ 125–143. On January 29, 2026, this Court issued a preliminary injunction, finding that Jolt is likely to succeed on the merits of its First Amendment retaliation claim and its claim under § 11(b) of the VRA. PI Order 16–25.

## LEGAL STANDARD

Rule 12(b)(1) of the Federal Rules of Civil Procedure governs motions to dismiss for lack of subject-matter jurisdiction. A court must dismiss a claim under Rule 12(b)(1) when it "lacks the statutory or constitutional power to adjudicate the case." *Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014) (citation omitted).

Rule 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief can be granted. When reviewing Rule 12(b)(6) motion, the court accepts all factual allegations in the complaint as true and views them in the light most favorable to plaintiffs. *See Sterling v. City of Jackson*, 159 F.4th 361, 372 (5th Cir. 2025). To survive a motion to dismiss, the complaint must allege sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citation omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## ARGUMENT

### I. This Court Properly Declined to Abstain on *Younger* Grounds.

In granting Jolt's preliminary-injunction motion, this Court declined to abstain under *Younger v. Harris*, 401 U.S. 37 (1971), on two independent grounds. First, the Court held that "proceedings of

4

substance" had already occurred in federal court—in the context of Jolt's prior lawsuit—before Defendant initiated the quo warranto proceeding. PI Order 11–12 (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 238 (1984)). Second, the Court concluded that Jolt "has met its burden to prove that Defendant is acting in bad faith." PI Order 13. Under the "law of the case doctrine," this Court's conclusion that *Younger* is inapplicable is subject to "a strong presumption of finality within the case, resting 'on the salutary and sound public policy that litigation should come to an end.'" *United States v. Mendez*, 102 F.3d 126, 131 (5th Cir. 1996) (quoting *White v. Murtha*, 377 F.2d 428, 431 (5th Cir. 1967)); *accord Med Ctr. Pharmacy v. Holder*, 634 F3d 830, 834 (5th Cir. 2011). Defendant's amended motion to dismiss raises no new arguments regarding *Younger* abstention. This Court should therefore continue to exercise jurisdiction over this case.

## II.    Jolt Has Stated a Claim Under § 11(b) of the VRA.

For the reasons stated in the Court's preliminary-injunction opinion, *see* PI Order 22–25, Defendant identifies no insufficiency in Jolt's allegations supporting its § 11(b) claim. As relevant here, § 11(b) provides that "[n]o person . . . shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce . . . any person for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b). The VRA defines the term "vote" broadly to encompass "all action necessary to make a vote effective." 52 U.S.C. § 10310(c)(1). That definition encompasses voter-registration activities like those in which Jolt and its VDRs engage, which Defendant does not appear to dispute. *See Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968) (stating that § 11(b) encompasses "the assisting of others in registering to vote"); *see also* PI Order 23 (citing *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967)). Defendant makes three arguments for dismissing Jolt's § 11(b) claim, none of which is availing.

*First*, Defendant contends that Jolt has failed to state a § 11(b) claim because Jolt has not adequately alleged that any person was actually intimidated. Am. MTD 17–19. But a § 11(b) claim does not depend on the subjective reactions of the defendant's targets, and, in any event, Jolt has alleged actual intimidation, as this Court already found. *See* PI Order 24–25. That § 11(b) does not require actual intimidation is evident from the statute's plain text, which expressly prohibits any "*attempt* to intimidate, threaten, or coerce," not just efforts that succeed in changing an individual's behavior. 52 U.S.C. § 10307(b) (emphasis added). In other words, § 11(b) prohibits all conduct that a "reasonable" person, "familiar with the context" in which the conduct occurs, "would view as a threat of injury to deter individuals" from assisting individuals in voting. *Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 113 (S.D.N.Y. 2023). This objective standard "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69 (2006). Whether Defendant's intimidation achieved its predictable effect is therefore beside the point. *League of Women Voters of N.H. v. Kramer*, No. 24-cv-73, 2025 WL 919897, at *7 (D.N.H. Mar. 26, 2025) (holding that plaintiffs had standing to bring a § 11(b) claim concerning a robocall discouraging voters from voting in a primary election even though the plaintiffs "realized the calls were fake and voted anyway"); *see also McLeod*, 385 F.2d at 740–41 (holding that a county's decision to arrest and prosecute Black voters attempting to register "had a coercive effect" in violation of § 131(b) of the Civil Rights Act of 1957— a provision interpreted largely in parallel with § 11(b)—because of the "chilling effect" such activity naturally "would have . . . on a voter registration drive").

But even if actual intimidation were an element of a § 11(b) claim, Jolt has alleged actual intimidation, as the Court found when granting Jolt a preliminary injunction. *See* PI Order 24–25. "Defendant's actions taken against [Jolt] have chilled Plaintiff's expressive activity and hampered its

6

efforts to assist others in registering to vote." *Id.* at 24. Jolt fears "public disclosure of personal identifying information of its VDRs and the voters they help register," and that "[s]uch disclosure [would] subject VDRs and voters to threats and harassing communications." Am. Compl. ¶ 101. In response to Defendant's intimidation, Jolt has instituted new administrative tasks that go well beyond what Texas law or best practices require so that it can defend itself against any spurious accusations of wrongdoing. *Id.* ¶ 82. This redundant and unnecessary documentation of its activities has diverted Jolt staff time away from registering voters. *Id.* Defendant's intimidation also has harmed Jolt's reputation, leading to a reduction in Jolt's fundraising and forcing Jolt to lay off staff. *Id.* ¶ 76. Thus, Defendant's campaign of intimidation has resulted in an actual reduction in voter-registration activity on Jolt's part. *See* PI Order 25 (noting that Jolt's diversion of resources in response to Defendant's intimidation campaign has resulted in a "significant reduction in the number of voters Plaintiff registers"). And of course, if the quo warranto proceeding were successful, Jolt would lose its charter and be entirely unable to register voters. *Id.* at 24.

*Second*, Defendant argues that Jolt has failed to allege a causal connection between the quo warranto proceeding and any intimidation. *Id.* at 19–20. But just as § 11(b) does not require actual intimidation, it also contains no causation requirement. The omission of a causation requirement is no accident. Neighboring statutes contain express causation requirements. For example, § 11(e) of the VRA criminalizes "vot[ing] more than once in an election," when doing so actually leads to the casting of multiple ballots for "an election to the same candidacy or office." 52 U.S.C. § 10307(e)(1), (3). Section 2 of the VRA prohibits procedures that "result[] in a denial or abridgement of the right of any citizen of the United States to vote." 52 U.S.C. § 10301(a). And the Materiality Provision of the Civil Rights Act of 1964 prohibits state actors from using immaterial paperwork errors to "deny the right of any individual to vote in any election." 52 U.S.C. § 10101(a)(2)(B). The

7

absence of similar language in § 11(b) demonstrates that Congress did not intend to impose a causation requirement. *See White*, 548 U.S. at 62–63. At most, any causation requirement should be limited to whether Defendant's conduct "could have caused" a reasonable person to be intimidated. *Fair Fight Inc. v. True the Vote*, 710 F. Supp. 3d 1237, 1283 (N.D. Ga. 2024), *appeal docketed*, No. 24-10372 (11th Cir.). Of course, the standards governing Article III standing require a § 11(b) plaintiff to establish causation in the sense of alleging an "injury in fact" that is "fairly traceable to the challenged conduct." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). But Defendant concedes that Jolt has adequately "alleged Article III standing." Am. MTD 20.

Even if causation were an element of a § 11(b) claim, Jolt's allegations establish it. There is no question that Defendant's campaign of reprisal is the source of the intimidation that has prompted Jolt to divert its resources. *See supra* pp. 6–7. Defendant's causation argument fails to address any of those manifestations of intimidation. Instead, he focuses only on disclaiming responsibility for threats made by third parties in response to Defendant publicizing his actions toward Jolt. Am. MTD 19–20. Defendant misses the point. Setting aside his responsibility for creating a climate that fosters threats against Jolt, Defendant unquestionably is responsible for his year-and-a-half-long effort through a variety of procedural mechanisms to uncover the identities of Jolt's VDRs and the voters they have registered. Am. Compl. ¶¶ 47, 71–72; *see also* ECF No. 34. A "reasonable" person "familiar with the context" would view disclosure of their affiliation with a group that Defendant has baselessly targeted for civil enforcement as "a threat of injury." *Wohl*, 661 F. Supp. 3d at 113. "No one wants to be the next person the Attorney General attacks with a frivolous threat of prosecution or unjustified law enforcement raid." Am. Compl. ¶ 99. Third parties' threats against Jolt in response to Defendant's actions are merely additional "context" that underscore why a "reasonable" person would fear being connected to Jolt under these circumstances. *Wohl*, 661 F. Supp. 3d at 113. Those concerns are all

the more reasonable in light of Defendant's track record of publicly disclosing confidential records that he obtains through his investigations. Am. Compl. ¶ 96.

*Finally*, Defendant asserts that a § 11(b) claim cannot be premised on "lawful enforcement of state election law." Am. MTD 18. As this Court held in granting Jolt's preliminary-injunction motion, however, the quo warranto proceeding is *illegitimate* and conceived in bad faith. PI Order 24–25 ("Defendant has not convinced the Court that his actions are 'legitimate attempts to enforce election law.'" (quoting ECF 24, at 21–22)); see also *id.* at 13–16. Moreover, the Fifth Circuit has left no doubt that even an otherwise lawful investigation becomes unlawful if it undermines the "right to engage in assisting others to register to vote" in violation of § 11(b). *Whatley*, 399 F.2d at 526. "[I]t is unimportant what the state prosecuting officer may denominate the conduct" of plaintiffs in such cases. *Id.* Section 11(b) extends to—and prohibits—"official acts of harassment" by the state, including "'attempts to punish'" that would "otherwise" be appropriate under state law. *Id.* The Fifth Circuit has reached the same conclusion with respect to § 131(b) of the Civil Rights Act of 1957. *See McLeod*, 385 F.2d at 740 ("Acts otherwise entirely within the law may violate the statute if they have the proscribed effect and purpose."). Section 11(b) thus ensures that state officials treat voting rights with the proper solicitude by not lightly wielding their power in ways that will chill voting rights. Defendant's actions demonstrate anything but the required delicacy that Section 11(b) requires when it comes to official action that trenches upon voter-registration activity.

## III.    Jolt Has Stated a First Amendment Associational Claim.

Defendant argues (at 15–17) that he is entitled to qualified immunity on Jolt's First Amendment associational claim. As explained below, *see infra* p. 14, qualified immunity does not apply to that claim, which seeks only declaratory and injunctive relief. Defendant does not contend that Jolt fails to state a First Amendment associational claim. For thoroughness's sake, however, Jolt will

address the arguments Defendant raises concerning qualified immunity on that claim, to the extent that they (generously) might be construed as an argument for dismissal for failure to state a claim.

As the Supreme Court recognized in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Id.* at 462. "[E]xacting scrutiny" applies to compelled disclosure of associational information. *Ams. for Prosperity Found. v. Bonta* (*AFP*), 594 U.S. 595, 607 (2021) (quoting *Buckley v. Valeo*, 424 U.S. 1, 64 (1976)). Under that standard, "there must be 'a substantial relation between the disclosure requirement and a sufficiently important government interest.'" *Id.* (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). To withstand exacting scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (quoting *Reed*, 561 U.S. at 196).

Defendant "assum[es] *arguendo*" that his "discovery requests implicate associational interests." Am. MTD 15. There is no doubt on that score. Defendant's discovery requests seek the identities of (1) all VDRs affiliated with Jolt between January 1, 2023, and the present; and (2) every voter that a Jolt VDR has registered during that span. Disc. Reqs. 11 (Interrogatory No. 1 requiring Jolt to "[i]dentify each [VDR] dispatched by You to distribute voter registration applications);[2] *id.* (Interrogatory No. 4 requiring Jolt to "list the names of each [VDR] who participated in the voter registration drives" disclosed in response to Interrogatory Nos. 2 or 3); *id.* at 12 (Request for Production No. 2 requiring disclosure of "all receipts of completed voter registration applications

---

[2] On January 13, 2026, defense counsel notified Jolt that Defendant had withdrawn Interrogatory No. 1. Ex. A. That is of no moment because Interrogatory No. 4 also seeks the identities of Jolt's VDRs. And even if Interrogatory No. 1 were the only discovery request that sought associational information (and it is not), Defendant's "voluntary cessation of . . . challenged conduct does not moot an action." *Lackey v. Stinney*, 604 U.S. 192, 204 (2025).

prepared by Your [VDRs]"). "[V]oter registration drives involve core protected speech"—both the VDR "[s]oliciting, urging and persuading the citizen to vote" and the voter "indicating his desire to be registered." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 390 (5th Cir. 2013); *see* PI Order 17. With speech on both sides of the equation, voter registration therefore entails First Amendment activity "advanced by association." *NAACP*, 357 U.S. at 460. Defendant also seeks the disclosure of Jolt's Internal Revenue Service (IRS) Form 990s from the past five years. Disc. Reqs. 13 (Request for Production No. 8). Schedule B to IRS Form 990 requires nonprofits like Jolt to disclose the names and addresses of donors who have contributed more than $5,000 in a particular tax year. 26 C.F.R. § 1.6033-2(a)(2)(ii)(F). In *AFP*, the Supreme Court held that another state attorney general's compelled disclosure of Schedule Bs "impose[d] a widespread burden on donors' associational rights." 594 U.S. at 618. So too here.

Attempting to distinguish *NAACP*, Defendant argues that Jolt's First Amendment associational claim fails because "Jolt is not a membership-based civil-rights or partisan advocacy organization engaged in core political expression." Am. MTD 16. But "[p]rotected association 'furthers a wide variety of political, social, economic, educational, religious, and cultural end.'" *AFP*, 594 U.S. at 606 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). And which category the protected activity falls into is "immaterial" to the First Amendment's applicability. *NAACP*, 357 U.S. at 460. The Supreme Court has therefore applied First Amendment scrutiny not only to compelled disclosure of membership lists, but also to compelled disclosure of referendum-petition signatories' identities. *Reed*, 561 U.S. at 194–95. Just as "the very nature of the petition process requires association between the third-party circulator and the individuals agreeing to sign," the "underlying conduct" in voter-registration drives of "encouraging democratic participation and voting" is by nature associational. *Steen*, 732 F.3d at 390 (quoting *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 898 (5th

11

Cir. 2012)).

Defendant also contends that compelled disclosure of the information sought in his discovery requests is substantially related to "[e]lection integrity." Am. MTD 16. But Defendant's discovery requests are purportedly tailored not to his putative enforcement goals, but solely to establishing venue for his quo warranto proceeding in the District Court of Tarrant County, Texas. Disc. Reqs. 1 (denominating discovery as "with respect to venue" (all caps omitted)). As Jolt has explained in its motion to transfer venue, Harris County—where Jolt maintains its "principal office"—would be the proper venue for Defendant's quo warranto petition. Ex. B (quoting Tex. Civ. Prac. & Rem. Code § 15.002(a)). Establishing venue in Defendant's preferred forum, as opposed to the District Court for Harris County, Texas, does not serve an "important government interest." *Reed*, 561 U.S. at 196.

Nor is there a "substantial relation" between Defendant's sweeping discovery requests and establishing venue in Tarrant County. Among Defendant's 56 discovery requests, some are specifically targeted at ascertaining Jolt's operations—if any—in Tarrant County. *See, e.g.*, Disc. Reqs. 13 (Request for Production No. 9 requiring disclosure of "all documents mentioning any one or more voter registration drives which You conducted in Tarrant County since January 1, 2023"). But other requests, including those seeking disclosure of the names of VDRs, voters registered by Jolt, and IRS Form 990s are not so limited. *See, e.g.*, Disc. Reqs. 11–13 (Interrogatory Nos. 1–5 and Request for Production Nos. 2–3, 8, 11). Defendant has no venue-related need to identify every Jolt VDR and voter registered by the organization statewide. Indeed, the requests related to those topics seek the same information that Defendant sought through his voluntarily abandoned request to examine. *See* RTE 6; PI Order 8.

And even if "[e]lection integrity" were the relevant governmental interest (and it is not), Am. MTD 16, Defendant's assertion of that interest rests on the same baseless accusations on which his

quo warranto proceeding and the RTE before it were premised.  As this Court held in granting Jolt's preliminary-injunction motion, Defendant brought the quo warranto proceeding in bad faith and has no credible evidence that Jolt, its VDRs, or the voters with whom they associate have engaged in any wrongdoing.  PI Order 13–16; *see also id.* at 26 ("Defendant has presented no evidence to credibly suggest that Texas's election integrity is at risk.").  Accordingly, Defendant's discovery requests—which amount to the latest installment in Defendant's fishing expedition against Jolt—are not substantially related to furthering election integrity.

Defendant also objects that social media posts threatening Jolt are not attributable to him. Am. MTD 14–15; *see also* Am. Compl. ¶¶ 83–89.  Jolt included allegations concerning those posts in the first amended complaint to establish the chilling effect that disclosure of the information that Defendant seeks in his discovery requests would have on Jolt, its VDRs, and voters with whom they associate.  Am. Compl. ¶ 139.  In *AFP*, the Supreme Court found that disclosure of nonprofits' Schedule Bs would have a chilling effect based in part on "evidence that they and their supporters have been subjected to bomb threats, protests, stalking, and physical violence."  594 U.S. at 617.  The Court further noted that "[s]uch risks are heightened in the 21st century and seem to grow with each passing year, as 'anyone with access to a computer [can] compile a wealth of information about' anyone else, including such sensitive details as a person's home address or the school attended by his children."  *Id.* (alteration in original) (quoting *Reed*, 561 U.S. at 208 (Alito, J., concurring)).  Jolt VDRs and the voters they have registered similarly have every reason to fear that their affiliation with Jolt being disclosed would lead to harassment and possibly violence, in light of social media posts like those referenced in the first amended complaint.

IV.    **Defendant's Immunity Arguments Fail.**

Defendant contends that sovereign and qualified immunity bar Jolt's damages claims (but not its declaratory- or injunctive-relief claims). Those arguments are confused and imprecise. Among Defendant's immunity arguments, the only one that is coherent in light of Jolt's claims is his assertion of qualified immunity as to Jolt's First Amendment retaliation claim. But Jolt's allegations plausibly allege a violation of clearly established law governing First Amendment retaliation.

### A.  Most of Defendant's Immunity Arguments Fail at the Threshold.

Two of Defendant's immunity arguments are irrelevant because they pertain to claims not raised by Jolt. First, Defendant contends that sovereign immunity "bars claims for monetary damages against the Attorney General in his official capacity." Am. MTD 11. But Jolt seeks damages from Defendant only in his *individual* capacity, and sovereign immunity "does not erect a barrier" to such damages claims under 42 U.S.C. § 1983. *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991). Jolt's claims for declaratory and injunctive relief are appropriately brought against Defendant in his *official* capacity. As Defendant appears to concede, sovereign immunity does not apply to those claims for injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908).

Second, it is not entirely clear as to which claims Defendant is invoking qualified immunity. As Defendant appears to recognize, qualified immunity is available only as to "claims for damages," not claims for declaratory or injunctive relief. Am. MTD 11; *see also Chrissy F. ex rel. Medley v. Miss. Dep't of Pub. Welfare*, 925 F.2d 844, 849 (5th Cir. 1991) (holding that "qualified immunity" does not "extend[] to suits for injunctive or declaratory relief under § 1983"). To be clear, Jolt's first amended complaint seeks declaratory and injunctive relief on all of its claims. But it seeks damages only on its First Amendment retaliation claim. To the extent that Defendant raises qualified immunity as to any of Jolt's claims for declaratory and injunctive relief, it is irrelevant. And because qualified immunity

14

appears to be the only argument Defendant has raised for dismissing on the merits Jolt's First Amendment retaliation and associational claims seeking declaratory and injunctive relief, he has forfeited any challenge to those claims.

**B. Defendant Is Not Entitled to Qualified Immunity on Jolt's First Amendment Retaliation Claim.**

Qualified immunity does not shield Defendant from damages for his campaign of unconstitutional intimidation, harassment, and retaliation against Jolt. To overcome qualified immunity at the motion-to-dismiss stage, a plaintiff must "plead[] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). At bottom, qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

Although the Supreme Court has warned against "defin[ing] clearly established law at a high level of generality," *al-Kidd*, 563 U.S. at 742, it has made equally clear that, because "officials can still be on notice that their conduct violates established law even in novel factual circumstances," courts need not have previously held that the precise action at issue is unlawful, *Hope*, 536 U.S. at 740–41; *see al-Kidd*, 563 U.S. at 741 ("We do not require a case directly on point."). Nor are courts required to identify cases with "fundamentally similar" facts. *Hope*, 536 U.S. at 740–41. Rather, precedent need only make the violation "apparent." *Id.* at 739, 743. In some instances, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Taylor v. Riojas*, 592 U.S. 7, 9 (2020) (quoting *Hope*, 536 U.S. at 741); *Rivas-Villegas v.*

15

*Cortesluna*, 595 U.S. 1, 4–6 (2021). The plaintiff bears the "burden to demonstrate that qualified immunity is inappropriate at the motion to dismiss stage," but the assertion of a qualified-immunity defense "does not subject the complaint to a heightened pleading standard." *Santander v. Salazar*, 133 F.4th 471, 478 (5th Cir. 2025) (internal quotation marks omitted).

Defendant does not appear to contest, at the first prong of the qualified-immunity analysis, that Jolt has plausibly alleged First Amendment retaliation. Plaintiffs bringing a retaliation claim "must show that (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). As this Court found in granting Jolt's preliminary-injunction motion, Jolt has not only plausibly alleged but established evidence of each of those elements. *See* PI Order 16-22. Jolt has engaged in two forms of protected activity: voter registration efforts that constitute core political speech, *see Steen*, 732 F.3d at 389–90, and filing a prior federal lawsuit protected by the right to petition for redress of grievances, *see Wilson v. Thompson*, 593 F.2d 1375, 1387 (5th Cir. 1979). *See* PI Order 17. The quo warranto proceeding, which threatens Jolt with an organizational death sentence, would chill a person of ordinary firmness from exercising First Amendment rights. *See Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999); *Bailey v. Iles*, 87 F.4th 275, 289 (5th Cir. 2023); *Keenan*, 290 F.3d at 259. And, as for causation, the quo warranto petition on its face demonstrates that Defendant is targeting Jolt in a bad faith effort to suppress Jolt's constitutionally protected activity. *See Netflix, Inc. v. Babin*, 88 F.4th 1080, 1094–95 (5th Cir. 2023). The petition fails to provide a single specific or credible allegation of wrongdoing that might give Defendant probable grounds for seeking quo warranto relief; instead, the petition contains only partisan smears against Jolt and explicitly criticizes both Jolt's voter registration

16

activities and its filing of the prior federal lawsuit. *See* PI Order 19-22. Jolt has thus stated a claim for First Amendment retaliation.

As for the second prong of the qualified-immunity analysis, at the time Defendant sought leave to file the quo warranto petition in 2025, it was clearly established that a state official could not use civil enforcement powers to retaliate against a nonprofit advocacy organization for its disfavored First Amendment activity. Indeed, the Supreme Court recently held exactly that in *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 181 (2024). The Court there "d[id] not break new ground" in holding that "the First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech." 602 U.S. at 197–98. And the Court applied that "general principle" to facts remarkably similar to those of this case. *Id.* at 197. In *Vullo*, the NRA brought a First Amendment retaliation claim against the head of New York's Department of Financial Services, alleging that she launched investigations and brought civil enforcement actions against NRA-affiliated insurance products in order to punish or suppress the NRA's disfavored gun-promotion activities. *Id.* at 185. The Supreme Court held that the complaint plausibly stated a First Amendment retaliation claim because the defendant official allegedly "threaten[ed] enforcement actions against []regulated entities in order to punish or suppress the NRA's gun-promotion advocacy." *Id.* at 187. Jolt's allegations are much the same—except Defendant's actions here are far more egregious and direct. He seeks to revoke Jolt's charter in retaliation for its constitutionally protected voter-registration activities, despite failing to provide any factual basis for his accusations of wrongdoing. That violates clearly established law. *See also Keenan*, 290 F.3d at 259 (holding that the filing of misdemeanor charges "under suspicious circumstances" would chill First Amendment expression); *Bailey*, 87 F.4th at 289.

Fifth Circuit precedent likewise clearly establishes that filing bad faith enforcement actions in retaliation for expressive activity violates the First Amendment. *Netflix*, 88 F.4th at 1099 (holding that

allegations satisfying *Younger*'s bad-faith exception necessarily also state a claim for First Amendment retaliation).  As this Court already concluded in granting a preliminary injunction, *see* PI Order 15, the evidence of bad faith here is quite similar to the "'mosaic' of bad faith" that the Fifth Circuit held unconstitutional in *Netflix*.  88 F.4th at 1096.  Most significantly, after Jolt's "assertion of its First Amendment rights" in *Jolt I*, Defendant "upp[ed] the ante" by withdrawing his RTE and instead petitioning to revoke Jolt's charter, a far "more severe" action.  *Id.* at 1092–94.  And he did so "despite identifying no new facts or evidence" in the investigation that he voluntarily ended before jumping straight to quo warranto.  *Id.*  *Netflix* would put any reasonable official on notice that the First Amendment forbids a campaign of escalating enforcement actions in retribution for disfavored expressive activity.  PI Order 15 (describing the similarities between this case and Netflix as "convincing indicia of Defendant's bad faith").

Defendant offers almost no response.  His principal argument with respect to qualified immunity appears to be that it was not clearly established at the time of his actions that the right to petition for redress of grievances included a right to be free from retaliation for filing lawsuits.  MTD 13–14 (citing *Hale v. Townley*, 45 F.3d 914, 919–20 (5th Cir. 1995)).  That argument fails for multiple reasons.  First, it disregards *Wilson v. Thompson*, 593 F.2d 1375 (5th Cir. 1979).  In that case, a prosecutor reactivated a dormant criminal case against the plaintiffs after one of them brought a civil case against the officers who had arrested her.  *Id.* at 1379–80.  The plaintiffs subsequently brought a federal lawsuit seeking to enjoin the prosecution.  *Id.* at 1380.  In analyzing whether the plaintiffs had engaged in protected activity, the Fifth Circuit had "no doubt but that the plaintiffs have successfully shown that Wilson's filing of the civil lawsuit was constitutionally protected conduct."  *Id.* at 1387.  The Fifth Circuit has thus squarely held that filing a lawsuit is protected activity for the purpose of First Amendment retaliation claims.  And although the court could not determine on the appeal record

18

whether the prosecutor's reactivation of the criminal case was motivated by retaliatory animus, *id.* at 1388, it left no doubt that sufficient evidence on that score would establish a viable First Amendment retaliation claim.

*Hale* did not muddy the waters. In that case, the plaintiff "had filed and won a suit challenging law enforcement officials, without official impediment or interference." 45 F.3d at 920. Afterward, the plaintiff alleged that officers launched a campaign of harassment against him "for his successful litigation." *Id.* at 916, 920. *Hale* held that, as of 1988, "the right of access to the courts was limited to a facilitative right to institute a suit without official impediment," and it was not clearly established that the First Amendment prohibited "retaliation against an individual for having filed and won a lawsuit." *Id.* at 920. But at the same time, *Hale* reaffirmed that "if state officials in some way retaliate against an individual for seeking redress through the courts, they have violated that person's right of access to the courts." *Id.* (quoting *Crowder v. Sinyard*, 884 F.2d 804, 813 n.9 (1990)). Here, Jolt did not win its prior federal lawsuit, so *Hale*'s reasoning does not apply. Instead, unlike in *Hale*, Defendant has engaged in "an ongoing, intentional course of conduct," including his actions in inducing Jolt to dismiss its prior federal lawsuit, PI Order 12, that have "imped[ed]" and "interfere[d]" with Jolt's access to a federal forum, *Hale*, 45 F.3d at 920. By expressly invoking Jolt's prior federal lawsuit in his quo warranto petition, Am. Compl. ¶ 60, Defendant sends the message that any further attempt by Jolt to hold him accountable will be met with increasingly severe consequences.

But even assuming that it was not clearly established in 1988—the time of the conduct at issue in *Hale*—that the First Amendment prohibits state officials from retaliating against a plaintiff for filing a lawsuit, that proposition has become clear over the intervening 30 years. *See Netflix*, 88 F.4th at 1092 (holding that a prosecutor likely violated the First Amendment by retaliating against Netflix for filing a habeas corpus petition); *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995) ("The law of this circuit

19

is clearly established, and was so in 1990 when the instant disciplinary charges issued, that a prison official may not retaliate against or harass an inmate for exercising the right of access to the courts."); *Van Deelen v. Johnson*, 497 F.3d 1151, 1156 (10th Cir. 2007); *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997).  Second, even if the Fifth Circuit has not previously dealt with the precise scenario of a quo warranto petition filed in retaliation for a prior federal suit, the First Amendment "appl[ies] with obvious clarity to [that] specific conduct." *Taylor*, 592 U.S. at 9.  And in any event, the filing of *Jolt I* is not the only protected activity at issue.  Jolt also claims retaliation based on its expressive voter-registration activity, which Defendant does not contest involves core political speech. *See Steen*, 732 F.3d at 389–90.

Finally, Defendant suggests in passing that he is entitled to qualified immunity because he is seeking to enforce state law.  MTD at 13.  But the Supreme Court in *Vullo* rejected a nearly identical argument.  Whereas Jolt vehemently denies any wrongdoing, it was "conceded" in *Vullo* that the "NRA-endorsed insurance programs" at issue in the case were "illegal[]."  602 U.S. at 196.  But the Supreme Court held that made no difference: "[A]lthough Vullo can pursue violations of state insurance law, she cannot do so in order to punish or suppress the NRA's protected expression." *Id.* So too here.  Defendant is free to enforce Texas's election laws.  But he cannot wield his enforcement authority in bad faith to punish an advocacy organization for exercising its First Amendment rights. That was abundantly clear at the time of Defendant's actions.

## CONCLUSION

For all the foregoing reasons, this Court should deny Defendant's amended motion to dismiss.

Respectfully submitted this February 2, 2026,

Mimi Marziani
Texas Bar No. 24091906
mmarziani@msgpllc.com
Joaquin Gonzalez
Texas Bar No. 24109935
jgonzalez@msgpllc.com
MARZIANI, STEVENS &
GONZALEZ PLLC

500 W. 2nd Street
Suite 1900
Austin, TX 78701
Phone: (210) 343-5604

*/s/ Jonathan L. Backer*
Jonathan Backer*
Mary B. McCord*
William Powell*
Joseph Mead*
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Phone: (202) 662-6671
jb2845@georgetown.edu
mbm7@georgetown.edu
whp25@georgetown.edu
jm3468@georgetown.edu

*Admitted pro hac vice*

*Attorneys for Plaintiff*

21

## CERTIFICATE OF SERVICE

I hereby certify that, on February 2, 2026, I electronically filed the foregoing with the Clerk of the Court and served a copy upon all counsel of record registered to receive notice via the Court's CM/ECF system.

/s/ *Jonathan Backer*
Jonathan Backer